# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse  40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

## MOTION INFORMATION STATEMENT

Docket Number(s): 26-878

Caption [use short title]

Motion for: Bail Pending Appeal

United States of America v. Rechnitz

Set forth below precise, complete statement of relief sought:

The Court should grant bail pending appeal because of

sentencing errors made by the district court, and because

the appeal will take longer than the sentence imposed.

MOVING PARTY: Appellant (Jona Rechnitz)     OPPOSING PARTY: Appellee (United States of America)

☐ Plaintiff     ☐ Defendant

■ Appellant/Petitioner     ☐ Appellee/Respondent

MOVING ATTORNEY: Noam Biale     OPPOSING ATTORNEY: Lara Pomerantz

[name of attorney, with firm, address, phone number and e-mail]

Sher Tremonte LLP, 90 Broad St, Fl. 23     USAO's Office for the Southern District of New York, 26 Federal Plaza

New York, NY 10004     New York, NY 10007

nbiale@shertremonte.com 212-202-2600     Lara.Pomerantz@usdoj.gov 212-637-2343

Court- Judge/ Agency appealed from: SDNY - Katherine Polk Failla, Judge

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
■ Yes  ☐ No (explain):_____

Opposing counsel's position on motion:
☐ Unopposed ■ Opposed ☐ Don't Know

Does opposing counsel intend to file a response:
☐ Yes ☐ No ■ Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:

Has this request for relief been made below? ☐ Yes ☐ No

Has this relief been previously sought in this court? ☐ Yes ☐ No

Requested return date and explanation of emergency: _____

Is the oral argument on motion requested?  ■ Yes  ☐ No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set?  ☐ Yes  ■ No If yes, enter date:_____

Signature of Moving Attorney:

_____  Date: May 4, 2026     Service : ■ Electronic  ☐ Other [Attach proof of service]

Form T-1080 (rev. 10-23)

No. 26-878-cr

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

JONA RECHNITZ,

*Defendant-Appellant*.

———————————————————

**MOTION FOR BAIL PENDING APPEAL**

Appeal from the United States District Court
for the Southern District of New York,
No. 16 Cr. 389 (KPF) Before the Honorable
Katherine Polk Failla

Noam Biale
Michael Bass
SHER TREMONTE LLP
90 Broad St., 23rd Floor
New York, New York 10004
(212) 202-2600

*Attorneys for Defendant-Appellant*
*Jona Rechnitz*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT.................................................................................1

BACKGROUND ....................................................................................................2

    I.    Factual Background...................................................................2

ARGUMENT ........................................................................................................9

    I.    Legal Standard.........................................................................9

    II.    The Court Should Grant Bail Pending Appeal.......................9

        a.    Mr. Rechnitz is not a flight risk or a danger.............9

        b.    Mr. Rechnitz's appeal raises substantial questions that are likely to result in a reduced sentence that will be shorter than the length of the appeal process...........................10

            1.    The District Court Failed to Adequately Explain Mr. Rechnitz's Sentence ..................................11

            2.    The District Court Failed to Consider Mr. Rechnitz's Updated Circumstances ...............................13

            3.    The Time It Will Take to Resolve Mr. Rechnitz's Appeal on the Merits Will Exceed His Prison Sentence .........................................................16

CONCLUSION ...................................................................................................17

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
  552 U.S. 38 (2007) ..................................................................................11

*Pepper v. United States*,
  562 U.S. 476 (2011)..................................................................................14

*United States v. Chu*,
  714 F.3d 742 (2d Cir. 2013)......................................................................11

*United States v. Fernandez*,
  104 F.4th 420 (2d Cir. 2024)......................................................................13

*United States v. Hart*,
  906 F. Supp. 102 (N.D.N.Y. 1995) ...........................................................10

*United States v. Hernandez*,
  604 F.3d 48 (2d Cir. 2010).............................................................. 14, 15, 16

*United States v. Pugh*,
  945 F.3d 9 (2d Cir. 2019)......................................................................11, 12

*United States v. Randell*,
  761 F.2d 122 (2d Cir. 1985).........................................................................9

*United States v. Rechnitz*,
  75 F.4th 131 (2d Cir. 2023)...........................................................................6

*United States v. Rosa*,
  957 F.3d 113 (2d Cir. 2020).................................................................11, 12

*United States v. Seabrook*,
  968 F.3d 224 (2d Cir. 2020)..........................................................................4

*Villanueva v. United States*,
  893 F.3d 123 (2d Cir. 2018)............................................................... 14, 16

*Werber v. United States*,
   149 F.3d 172 (2d Cir. 1998)...............................................................................14

**Statutes**

18 U.S.C. § 3143(b) ......................................................................................9, 10

18 U.S.C. § 3553(a) .......................................................................................7, 11

18 U.S.C. § 3553(c) ..........................................................................................11

## PRELIMINARY STATEMENT

Jona Rechnitz, Defendant-Appellant in the above-captioned case, respectfully moves this Court for an order granting him bail pending appeal.

Mr. Rechnitz is appealing the sentence of five months' imprisonment imposed at a resentencing hearing that took place on March 20, 2026. In that hearing, the District Court (Hon. Katherine Polk Failla, J.) failed to explain the basis for her sentence beyond citing the seriousness of the offense. The District Court also failed to consider disparities between Mr. Rechnitz, a cooperator, and individuals against whom he cooperated, some of whom received similar or *lesser* sentences than he did. Finally, the District Court gave no consideration whatsoever to the five years that had elapsed between Mr. Rechnitz's original sentencing in 2019 and the substantial rehabilitation he had undergone in that time; instead, the District Court simply imposed effectively the same sentence Mr. Rechnitz received in 2019.

These procedural errors warrant vacatur of the sentence, but Mr. Rechnitz is likely to have served the entire sentence before he has an opportunity to litigate the matter fully before this Court. Accordingly, the Court should grant bail pending appeal.

**BACKGROUND**

I.       Factual Background

In June 2016, Mr. Rechnitz pleaded guilty, pursuant to a cooperation agreement, to conspiring to commit wire and honest services fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 1349.  Mr. Rechnitz admitted that, beginning in 2013, he engaged in a bribery scheme in which he served as the facilitator between Norman Seabrook, then President of the New York City Correctional Officers' Benevolent Association ("COBA"), and Murray Huberfeld, the founder of the Platinum Partners hedge fund.  *United States v. Rechnitz*, 16-CR-389 (KPF) (S.D.N.Y.), Dkt. 255 at 1 ("Gov't 2026 5K Ltr."), attached hereto as **Exhibit A**. The purpose of the arrangement was to pay Seabrook to induce COBA to invest millions of dollars of the union's pension fund in Platinum Partners, which was then looking to acquire more institutional investors.  *Id*. at 4.  At the end of each year, Seabrook would receive a kickback based on the performance of the investment.  *Id.*

Seabrook made an initial investment of $10 million, for which Mr. Rechnitz paid him $60,000 in cash.  At that point, Mr. Rechnitz faded from an active role in the scheme, and Seabrook ultimately steered an additional sum of approximately $10 million without Mr. Rechnitz's involvement.  *Id.*

The government's investigation revealed that Mr. Rechnitz did not personally profit from the scheme, but rather he sought to build relationships and solidify his place in the confidence of both Seabrook and Huberfeld.  *United States v. Rechnitz*, 16-CR-389 (KPF) (S.D.N.Y.), Dkt. 70 at 18 ("Gov't 2019 5K Ltr."), attached hereto as **Exhibit B**.  In lieu of payment for his role in the scheme, Rechnitz directed Huberfeld to write checks to certain charitable causes.  *Id.*

Nearly two years after Rechnitz facilitated the bribe, in October 2016, Platinum Partners collapsed and declared bankruptcy in the midst of SEC and Department of Justice investigations.  *See id.*  Of the $20 million that COBA invested, $19 million was lost.  Gov't 2026 5K Ltr. at 5.  It is undisputed that Mr. Rechnitz was unaware of any malfeasance or financial issues at Platinum Partners; indeed, relatives of his who had invested money with the fund lost substantial sums.  The District Court later cited these facts in holding that COBA's losses were not reasonably foreseeable to Mr. Rechnitz for the purposes of restitution.  *See United States v. Rechnitz*, 16-CR-389 (KPF) (S.D.N.Y.), Dkt. 236 at 5-7, 12.

Mr. Rechnitz cooperated with law enforcement in its investigation and prosecution of Seabrook, a powerful union president, and Huberfeld, a multi-millionaire businessman.  *See United States v. Rechnitz*, 16-CR-389 (KPF) (S.D.N.Y.), Dkt. 263 at 18:12-15 ("2026 Sent. Tr."), attached hereto as **Exhibit C**.  The first trial in which Mr. Rechnitz testified, before Judge Carter, ended in a hung

3

jury. The case was then transferred to Judge Hellerstein, and both Huberfeld (by plea) and Seabrook (by trial) were convicted based on Mr. Rechnitz's testimony. Gov't 2026 5K Ltr. at 10. As the government stated in the lead-up to Mr. Rechnitz's original sentencing before Judge Hellerstein, Mr. Rechnitz's "contributions to the Seabrook and Huberfeld prosecutions cannot be overstated. As a fundamental matter, the case could not have been charged without him." Gov't 2019 5K Ltr. at 25. Huberfeld was sentenced to 30 months in prison, which was later resentenced to seven months after this Court vacated his sentence. *United States v. Seabrook*, 968 F.3d 224 (2d Cir. 2020). Seabrook's sentence was also reduced, from 58 months to 21 months, but subsequently reinstated at 51 months. See *United States v. Seabrook*, 16-CR-467 (S.D.N.Y.), Dkt. Nos. 459, 486.

Mr. Rechnitz also provided substantial assistance in an unrelated police bribery investigation. Mr. Rechnitz gave information essential to the prosecutions of Jeremy Reichberg, a former City Hall fundraiser, and two influential NYPD leaders, Michael Harrington and James Grant, as well as testimony in a third trial before Judge Woods. Gov't 2026 5K Ltr. at 2-3, 7; *see also* 2026 Sentencing Tr. at 18:15-17. Reichberg was sentenced to 48 months and served approximately 13

4

months of that sentence. 2026 Sentencing Tr. at 29:23-25.[1] "As with *Seabrook*, the police bribery case could not reasonably have been charged in the form that it was without Rechnitz." Gov't 2019 5K Ltr. at 29.

Mr. Rechnitz also provided the government with information in several other investigations and was preparing to testify in a fourth trial when the defendant in that case pleaded guilty. 2026 Sentencing Tr. at 18:19–19:1. Mr. Rechnitz's contributions, which included attending over 80 proffers, supplying various materials to the government, and enduring lengthy cross-examination, merited his description as "one of the single most important and prolific white collar cooperating witnesses in the recent history of the Southern District of New York." Gov't 2019 5K Ltr at 2; *see also* 2026 Sentencing Tr. at 14:8-11, 17:10-22, 18:18–19:5 (discussing the extensive scope of Mr. Rechnitz's cooperation).

Notably, Mr. Rechnitz testified in three trials "under a kind of duress that is atypical of the experience of cooperating witnesses." Gov't 2019 5K Ltr. at 41. Throughout his cooperation, Mr. Rechnitz endured "disparagement and harassment," religious ostracization, public scrutiny, and physical threats. 2026 Sentencing Tr. at 16:10-16, 22:9-20, 23:7-13, 24:5-14, 25:6-24.

---

[1] Grant was acquitted.

Mr. Rechnitz was originally sentenced by Judge Hellerstein in December 2019 to five months' incarceration and five months' home detention. *United States v. Rechnitz*, 16-CR-389 (KPF) (S.D.N.Y.), Dkt. 84. Judge Hellerstein granted him bail pending appeal, and for more than five years, Mr. Rechnitz's sentence hung over him while restitution was litigated through district court proceedings, mandamus petitions, and a direct appeal. In 2023, this Court vacated Mr. Rechnitz's sentencing, holding that Judge Hellerstein had abused his discretion in failing to recuse himself based on personal connections he had to an indicted senior executive at Platinum Partners and an *ex parte* communication between the court and the government. *See generally United States v. Rechnitz*, 75 F.4th 131 (2d Cir. 2023). The Court remanded the case with instructions that it be assigned to a different district judge for resentencing. *Id.*

The case was subsequently reassigned to Judge Failla (the "District Court"). In October 2024, the District Court ordered Mr. Rechnitz to pay $1,206,000 in restitution, which he satisfied in a matter of days. 2026 Sentencing Tr. at 40:5-6.

The long-awaited resentencing occurred on March 20, 2026. The District Court considered several written submissions, including Mr. Rechnitz's sentencing submission, a supplementary letter from Mr. Rechnitz's counsel, the government's updated 5K1.1 motion, and other submissions in "traditional and less traditional

formats."[2]  *Id.* at 3:16–4:1.  In imposing sentence, the District Court addressed its obligations under 18 U.S.C. § 3553(a).  *Id.* at 37:15–38:6.  The District Court noted that Mr. Rechnitz's offense level was 27, yielding a Guidelines range of 70 to 87 months, a reduction in his original Guidelines range based on the application of the zero-point offender Guideline.  The District Court accepted that the government had moved for a sentence "without regard for the otherwise applicable [G]uidelines because of the substantial assistance that he has rendered in the investigation and prosecution of other people."  *Id*. at 39:11-14.

The District Court acknowledged Mr. Rechnitz's financial and personal growth, prompt restitution payments, and law-abiding conduct while on release.  *Id*. at 39:23–40:6.  Indeed, it stated that Mr. Rechnitz had done "all that [he] can to atone" for his criminal conduct.  *Id.* at 40:2-21.  The District Court stated that it "remain[ed] concerned," however, "about the seriousness of the offense and the impact on the public and the sheer scope of the corruption."  *Id.* at 40:7–41:1.

---

[2]    Prior to sentencing, the government received unsolicited submissions concerning allegations about recent conduct by Mr. Rechnitz.  These submissions were addressed through emails, letter filings, and a teleconference with the District Court.  Ultimately, the government represented at the resentencing that it did "not believe that the allegations undermine the defendant's substantial assistance provided to the government in past cases or his truthfulness in connection with that historical substantial assistance," 2026 Sentencing Tr. at 16:4-7, and the District Court did not consider these allegations in connection with resentencing.

Mr. Rechnitz presented the District Court with a strong record of genuine rehabilitation: gainful employment, community activism, charitable work, and continued cooperation. Mr. Rechnitz also pointed out that multiple of the defendants against whom he had testified had their sentences reduced, including Huberfeld, who was resentenced to only seven months' imprisonment, and Harrington, who was sentenced to probation. Yet despite that record, and the steep personal price he paid for his cooperation, the District Court imposed essentially the same sentence Mr. Rechnitz received more than five years prior by Judge Hellerstein—five months' imprisonment (the District Court did not impose five months' home incarceration but did impose two years of supervised release). Mr. Rechnitz moved for bail pending appeal orally after the District Court imposed sentence, which the District Court denied. *Id.* at 45:6-21.

On April 1, 2026, Mr. Rechnitz renewed his request for bail pending appeal, setting forth in detail his arguments as to why the District Court had committed procedural error in its sentencing determination. *United States v. Rechnitz*, 16-CR-389 (KPF) (S.D.N.Y.), Dkt. 265. The following day, the District Court denied Mr. Rechnitz's request, stating, "Defendant has presented no basis for the Court to reconsider its prior decision, and the Court does not believe that the sentence is procedurally or substantively unreasonable." *Id.*, Dkt. 266.

Mr. Rechnitz timely filed his notice of appeal on April 3, 2026. His surrender date to Bureau of Prisons custody is June 26, 2026.

**ARGUMENT**

II.    <u>Legal Standard</u>

A court "shall order" bail pending appeal if there is clear and convincing evidence that the defendant is "not likely to flee" or "pose a danger" and "the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in reversal, an order for a new trial" or "a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143(b) (cleaned up). A "substantial question" is "of more substance than would be necessary to a finding that it was not frivolous"—in other words, "a 'close' question or one that very well could be decided the other way." *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985). A defendant need not prove that she is likely to succeed on the substantial questions; it is sufficient that if she does succeed, reversal or a new trial or reduced sentence is likely. *Id.* at 124-25.

III.    <u>The Court Should Grant Bail Pending Appeal</u>

a. *Mr. Rechnitz is not a flight risk or a danger.*

Mr. Rechnitz has been on release for nearly ten years since his cooperation began in 2016 and has complied with all conditions of release without incident.

Notably, for approximately four of those ten years, he was on bail pending appeal after his initial sentencing by Judge Hellerstein, without issue.

Mr. Rechnitz has deep family ties—he is married with six children—is gainfully employed, and has paid the full amount of restitution ordered by the Court. There is simply no basis to conclude that Mr. Rechnitz poses any risk of flight or danger to the community. The government did not argue otherwise at sentencing, and the Court did not find any such risk.

Accordingly, there is "clear and convincing evidence that [Mr. Rechnitz] is not likely to flee or pose a danger to the safety of any other person or the community" if bail is continued pending appeal. 18 U.S.C. § 3143(b); *see, e.g.*, *United States v. Hart*, 906 F. Supp. 102, 105 (N.D.N.Y. 1995) (finding no risk of flight or danger where defendant had adhered to bail conditions, made all required appearances, and had strong community ties).

      b. *Mr. Rechnitz's appeal raises substantial questions that are likely to result in a reduced sentence that will be shorter than the length of the appeal process.*

Mr. Rechnitz is not pursuing this appeal for dilatory purposes. Rather, the appeal raises important questions of law, including whether the District Court erred by (1) failing to adequately explain its imposition of a five-month sentence of imprisonment; and (2) by reimposing effectively the same sentence originally imposed by Judge Hellerstein more than five years prior without considering

changed circumstances. Should this Court find procedural error in the District Court's sentencing analysis, Mr. Rechnitz's sentence would likely be reduced to a term that is shorter than the length of an ordinary appeal.

1. The District Court Failed to Adequately Explain Mr. Rechnitz's Sentence

The District Court erred by failing to state the reasons for sentencing Mr. Rechnitz to a five-month term of incarceration. 18 U.S.C. § 3553(c) requires a sentencing court to state "the reasons for its imposition of the particular sentence." Although a court is not required to discuss every factor contained in 18 U.S.C. § 3553(a) individually, it "must provide *some* oral account of its reasoning that would permit an understanding of how the District Court weighed the relevant considerations and selected the sentence imposed." *United States v. Rosa*, 957 F.3d 113, 119-20 (2d Cir. 2020). This Court has made clear that a District Court's failure to "adequately explain the chosen sentence" constitutes plain error. *See id.* at 120, 122; *see also United States v. Pugh*, 945 F.3d 9, 27 (2d Cir. 2019) ("The Supreme Court has identified as a 'significant procedural error' the failure 'to adequately explain the chosen sentence.'") (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)); *United States v. Chu*, 714 F.3d 742, 746 (2d Cir. 2013).

Here, the District Court's only stated reason for imposing the term of incarceration that it imposed was the "seriousness the offense." *See* Sentencing Tr. at 40:24–41:1; *see also id.* at 41:5-7 ("But given the nature of the conduct, I cannot

11

go to the sentence that he wishes me to go to."). "Those comments do not provide a basis for understanding why the particular sentence was imposed." *Pugh*, 945 F.3d at 27. And though the District Court stated that it considered "all of the factors set forth in Section 3553(a)" and read "all of the submissions in connection with sentencing," *see* Sentencing Tr. at 42:11-16, "the fact that the court considered the § 3553(a) factors and arguments does not satisfy the separate obligation under § 3553(c) to explain in open court how its consideration led to the sentence imposed." *Rosa*, 957 F.3d at 118.[3]

The District Court's limited explanation of its sentence also failed to address the unwarranted sentencing disparities between Mr. Rechnitz and his co-defendants, which Mr. Rechnitz raised repeatedly in his sentencing submissions and during the resentencing. *See* Sentencing Tr. at 29:11–30:14; *United States v. Rechnitz*, 16-CR-389 (KPF) (S.D.N.Y.), Dkt. No. 252 at 6. As he argued, Mr. Rechnitz's sentence of five months of incarceration constitutes an anomalous disparity in light of the sentence reductions received by those against whom he testified: in particular, Murray Huberfeld was resentenced to seven months; Jeremy

---

[3]    With respect to the one factor the District Court did discuss—the seriousness of Mr. Rechnitz's offense—the District Court also placed undue emphasis on Mr. Rechnitz's involvement with public officials, *see* Sentencing Tr. at 40:9-11, even though the primary conduct to which Mr. Rechnitz pleaded guilty was *private* honest services fraud and did not involve any public corruption.

12

Reichberg was sentenced to 48 months' imprisonment but served approximately thirteen months; and Michael Harrington, who pled guilty but did *not* cooperate, was not sentenced to any term of incarceration. *See* Sentencing Tr. at 29:11–30:14. Mr. Rechnitz cooperated against all of these individuals and was instrumental in securing their convictions.

Cooperators in this Circuit who testify in even one trial almost invariably receive substantially lower sentences than the defendants against whom they testified. Mr. Rechnitz testified in *three trials* but nonetheless received a sentence squarely in the middle of those imposed on the non-cooperating defendants. *Cf. United States v. Fernandez*, 104 F.4th 420, 428 (2d Cir. 2024) ("[A] reasonable explanation for a sentencing disparity [i]s readily apparent where there were varying degrees of culpability and cooperation between the various defendants." (internal citation and quotation marks omitted)). The District Court's failure to address the disparity between Mr. Rechnitz's and his co-defendants' sentences raises a substantial question about whether the District Court adequately considered the § 3553(a) factors.

> 2. The District Court Failed to Consider Mr. Rechnitz's Updated Circumstances

The District Court also erred by ignoring the "intervening developments" in Mr. Rechnitz's life between the date of his resentencing and his first sentence in 2019 by Judge Hellerstein. *See United States v. Hernandez*, 604 F.3d 48, 53 (2d

Cir. 2010). As this Court has held, a sentencing court is "required to resentence the defendant in light of the circumstances as they stood at the time of resentencing." *Villanueva v. United States*, 893 F.3d 123, 132 (2d Cir. 2018) (quoting *Werber v. United States*, 149 F.3d 172, 178 (2d Cir. 1998)). That is for the obvious reason that "evidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing." *Pepper v. United States*, 562 U.S. 476, 491 (2011). Indeed, in the context of resentencing, the Supreme Court has stated that such rehabilitation "may critically inform a sentencing judge's overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary,' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Id.*

In *Hernandez*, this Court vacated and remanded a resentencing where the district court re-imposed the same 405-month sentence after a fifteen-year delay without properly considering the defendant's rehabilitation and other intervening developments. 604 F.3d at 54-55. At the resentencing, the defendant presented evidence that he "succeeded at numerous vocational and educational efforts" and had no "record of any misconduct" during the time between his sentencings. *Id.* at 53. The district court "neither credited nor discredited" the evidence of "intervening developments" in the defendant's life, and instead, like the District Court here, "reapeted[ly] emphasi[zed] . . . the seriousness of the offense conduct."

14

*Id.* at 54-55. In vacating the sentence, this Court emphasized that the district court's finding regarding the seriousness of the offense conduct "was of course available-and made" during the initial sentencing. *Id.* at 55. By focusing on "the severity of the offense" and "overlook[ing]" the evidence post-dating the defendant's initial sentencing, the district court had failed "to resentence [the] defendant in light of the circumstances as [he] [stood] at the time of his resentencing." *Id.* 54-55.

So too here. As explained at sentencing and in his supplemental sentencing submission, Mr. Rechnitz has undergone significant rehabilitation since his sentencing in 2019. He paid restitution in the full amount determined by the District Court, has led a law-abiding life, maintained gainful employment, continued to cooperate with the government, and engaged in religious and charitable work. *See* 2026 Sentencing Tr. at 28:17–29:10; *United States v. Rechnitz*, 16-CR-389 (KPF) (S.D.N.Y.), Dkt. No. 252 at 5-8. Further, he argued that the length of time that his resentencing hung over his head was effectively a punishment that made additional imprisonment greater than necessary.

Even worse than in *Hernandez*, the District Court *credited* Mr. Rechnitz's rehabilitation, noting that he "has remained law abiding . . . over an extended period of time," "promptly paid the restitution figured assessed," and "done all that [he] can to atone for the criminal conduct in which [he] engaged." 2026

15

Sentencing Tr. at 40:2-21. But the District Court did not weigh those facts at all; it simply reimposed the same sentence that Judge Hellerstein imposed five years earlier. And the District Court did not address at all the fact—which undergirded substantial argument from counsel—that Mr. Rechnitz had lived in a state of purgatory during the five years he waited to be resentenced, which effectively served as a punishment for his crimes. It was procedural error for the District Court not to address these intervening developments as part of its analysis of the § 3553(a) factors or to explain in any way why the same sentence was still warranted despite Mr. Rechnitz's post-sentence rehabilitation. *See Hernandez*, 604 F.3d at 55; *Villanueva*, 893 F.3d at 132.

> 3. The Time It Will Take to Resolve Mr. Rechnitz's Appeal on the Merits Will Exceed His Prison Sentence

Mr. Rechnitz is currently scheduled to surrender to custody no later than June 26, 2026. Assuming he is not released early, he will complete his sentence on November 26, 2026. Given that the median time from filing notice of appeal to disposition in this Circuit is 12.5 months, *see* U.S. Admin. Office of Courts, U.S. Court of Appeals Summary, Mar. 31, 2022, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_appsumary0331.2022.pdf, Mr. Rechnitz's appeal will be rendered moot if he is not granted bail pending appeal.

16

## CONCLUSION

The Court should grant Mr. Rechnitz's motion for bail pending appeal.

Dated:  May 4, 2026
     New York, NY

/s/ *Noam Biale*
Noam Biale
Michael Bass
Sher Tremonte LLP
90 Broad St. 23 Floor
212-202-2600
nbiale@shertremonte.com
mbass@shertremonte.com

*Attorneys for Jona Rechnitz*

# EXHIBIT A

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 21, 2026

**BY ECF**

The Honorable Katherine Polk Failla
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

      Re:    *United States v. Jona Rechnitz*, 16 Cr. 389 (KPF)

Dear Judge Failla:

The Government respectfully submits this letter in advance of defendant Jona Rechnitz's resentencing scheduled for February 24, 2026, at 3:00 p.m. In light of the facts described below, and assuming that Rechnitz continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines, that the Court sentence Rechnitz in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

## I. The Underlying Criminal Conduct

Rechnitz began cooperating with the Government in May 2016. On June 8, 2016, Rechnitz pleaded guilty, pursuant to a cooperation agreement, to an information, which charged him with conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349. (Dkt. 10). Rechnitz participated in a conspiracy with two principal objects, both of which involved bribery and honest services wire fraud: (i) a scheme to bribe high-ranking officials in the New York City Police Department ("NYPD"), and (ii) a scheme to bribe Norman Seabrook, then the president of the New York City Correction Officers Benevolent Association ("COBA"), to induce Seabrook to invest millions of dollars of COBA's money with a hedge fund, Platinum Partners ("Platinum"), founded and co-owned by Murray Huberfeld. (PSR ¶ 11).[1]

In 2008, Rechnitz was a real estate businessman from Los Angeles who had moved to New York to begin his career. Around this time, he met Jeremy Reichberg, a self-styled community

---

[1] "PSR" and "Presentence Report" refer to the Presentence Investigation Report prepared by the United States Probation Office ("Probation Office") in connection with Rechnitz's sentencing, and which was last revised on March 23, 2020; "Tr." refers to the transcript of Seabrook's retrial, 16 Cr. 467; "Reichberg Tr." refers to the transcript of Jeremy Reichberg's and James Grant's trial, 16 Cr. 468 (GHW); "GX" refers to a Government exhibit at Seabrook's retrial; and "Dkt." refers to an entry on the Court's docket for this case.

organizer and self-appointed liaison between the Orthodox Jewish community in Borough Park, Brooklyn, and local law enforcement. (PSR ¶¶ 13, 14). Reichberg was a so-called "expediter" who dealt principally in assisting people in his community in their dealings with various local government entities, including the police. (PSR ¶ 13). Reichberg already had years-long relationships with various NYPD officials. (PSR ¶ 13). Within weeks of their meeting, Rechnitz joined Reichberg in providing occasional meals and donations to the NYPD's affiliated football team at the behest of several officers. (Reichberg Tr. 2637-39). Rechnitz and Reichberg asked those officers for favors, such as arranging for a police escort through the Lincoln Tunnel for the boss of the company where Rechnitz then worked. (Reichberg Tr. 2641-43 (describing the partial lane closure of the tunnel to expedite travel); PSR ¶ 24).

From this beginning developed the first of a number of ultimately corrosive and criminal relationships between Rechnitz and others in positions of power, including, among others, police officers, a union leader, and a hedge fund founder.

## A. The NYPD Bribery Scheme

Between 2013 and early 2015, Rechnitz and Reichberg escalated their criminal activity significantly. Several developments fueled this intensification. First, several of the police officers whom Rechnitz and Reichberg had built relationships with ascended to positions of power. Michael Harrington, whom Reichberg had known for years, became the Executive Officer to the Chief of Department. Through this relationship, Rechnitz and Reichberg came to lavish things of value upon Harrington's new boss, then-Chief of Department Philip Banks, who was the highest ranking uniformed officer in the NYPD, in order to cultivate a relationship with Banks. (PSR ¶¶ 17-19). James Grant, a former NYPD captain in Brooklyn, rose through the ranks such that he was eligible for a promotion to Commanding Officer of the Upper East Side's 19th Precinct in Manhattan, a promotion that Reichberg and Rechnitz helped secure through their lobbying of Banks and Harrington. (PSR ¶¶ 18, 20). The Presentence Report lists an array of other police relationships that Reichberg and Rechnitz cultivated during this period of time (see, e.g., PSR ¶¶ 23-28), but the positioning of Banks, Harrington, and Grant in 2013 through 2014 led to significant opportunities to lavish things of value on high-level officials and receive favors for Reichberg and Rechnitz, their friends and associates, and their business clients.

Reichberg and Rechnitz provided NYPD officials with the following things of value, among others:

- Reichberg and Rechnitz provided officials with free or nearly free trips to numerous vacation destinations, including Punta Cana, Las Vegas, and Los Angeles, and to sporting events—sometimes on private jets, and usually at luxury hotels. (PSR ¶¶ 12, 17, 22, 24, 27).

- On a few occasions, Reichberg and Rechnitz arranged for prostitutes to be available to the travelers, both in the United States and abroad. (PSR ¶¶ 12, 15, 17, 22).

- Banks received a luxury tour through Israel. (PSR ¶ 17).

- Banks and Harrington received thousands of dollars in meals at high-end kosher steakhouses in Manhattan. (PSR ¶¶ 17, 19).

- Rechnitz and Reichberg rented out a suite at the Meadowlands (now known as MetLife Stadium) for officials and their families at a New England Patriots–New York Jets game. (PSR ¶ 17; Reichberg Tr. 2893-94).

- Reichberg steered $70,000 worth of business to a private security business run by Harrington's relatives and close friend, and Rechnitz paid for hotel accommodations for a trip to Chicago Harrington took with family members and friends. (PSR ¶ 19).

- Harrington and Banks received expensive hockey and basketball tickets. (PSR ¶ 19).

- Rechnitz provided Banks with what amounted to a $20,000 gift disguised as a successful "investment" on his behalf. (PSR ¶ 18).

- Grant received numerous home improvements, including new railings and windows, along with luxury lodging during a vacation in Rome. (PSR ¶ 22).

- Reichberg and Rechnitz visited three Staten Island-based officers on Christmas day, bearing video game systems and high-end collectible dolls for their children. (PSR ¶ 20).

In total, Rechnitz and Reichberg gave approximately $225,000 worth of bribes in the form of in-kind benefits or payments to officials. In return, the officials provided Reichberg and Rechnitz with police-related favors, including (i) a parking placard, (ii) Grant's promotion and that of other officers known to Reichberg, (iii) the dispatch of a police boat to a private event Reichberg hosted, (iv) the dispatch of a police helicopter to a private event Reichberg hosted, (v) assistance in applying for gun permits they likely were not eligible for,[2] (vi) personal rides in police vehicles (for example, to the airport, with lights and sirens blaring), (vii) favorable treatment to individuals who had been ticketed or arrested in order to benefit Reichberg's business, and (viii) police action in addressing private disputes. (*See, e.g.*, PSR ¶¶ 18, 20-22, 56). In early 2015, some weeks after Banks resigned from his position as Chief of Department, Reichberg and Rechnitz were recorded on a judicially authorized wiretap, lamenting that they did not get even more for their investment in Banks and Harrington.

---

[2] As part of their effort to obtain gun permits, Reichberg and Rechnitz arranged for Rechnitz to be placed on the payroll of an associate's diamond business. Rechnitz did not actually work for the associate but used his purported employment with a risky business (*i.e.*, the diamond business) as a partial justification in applying for the firearm license. That application was fraudulent. Rechnitz also used the diamond company's health insurance plan to obtain health insurance for a period of approximately two years instead of setting up a health insurance plan through his own business. (Reichberg Tr. 2842-43).

Page 4

## B.  The COBA Bribery Scheme

Rechnitz had done business with Huberfeld, and the two were friends.  In late 2013, Huberfeld asked Rechnitz to help Platinum attract institutional investors.  (PSR ¶ 35).  Rechnitz responded that he would approach Seabrook about investing COBA's money with Platinum. (Tr. 634; PSR ¶ 35).  Seabrook, who had been introduced to Rechnitz earlier in 2013, wielded enormous power over the finances of COBA, the largest municipal jail union in the United States. (PSR ¶¶ 33-34).

In December 2013, Rechnitz took Seabrook and others on a trip to the Dominican Republic. (Tr. 632-33).  During the trip, Rechnitz told Seabrook that Seabrook could personally make money if he invested with Platinum on COBA's behalf.  Seabrook, who told Rechnitz that he controlled COBA's Annuity Fund, agreed to invest that fund's money with Platinum, remarking, "It's time Norman Seabrook got paid." (Tr. 634-37).  Rechnitz and Huberfeld then arranged to pay Seabrook based on a percentage of Platinum's profits from the COBA investment; Huberfeld estimated that Seabrook's share would exceed $100,000 annually.  (Tr. 641-42; PSR ¶ 36).

Before COBA invested in Platinum, its attorneys conducted due diligence and wrote letters—including a letter addressed to COBA's Board of Trustees—that expressed concerns about investing in a higher-risk vehicle like Platinum.  (PSR ¶¶ 37-38).  Seabrook concealed these letters, and the attorneys' concerns, from COBA's board in order to secure the board's approval for the investment.  (PSR ¶¶ 37-38).  At the behest of Seabrook, COBA invested a total of $20 million with Platinum.  First, in March 2014, Seabrook caused COBA's Annuity Fund to invest an initial $10 million with Platinum.  (PSR ¶ 39).  Rechnitz continued to speak with Huberfeld and Seabrook after that about the possibility of additional COBA investments with Platinum.  (Tr. 656, 677).  On May 1, 2014, Rechnitz reassured Huberfeld, based on a conversation Rechnitz had had with Seabrook, that Seabrook might cause COBA to invest $20 million more.  (Tr. 677).  Ultimately, Seabrook arranged for COBA to make two additional investments with Platinum totaling $10 million: a $5 million investment in June 2014 of funds COBA had set aside for a potential emergency; and a $5 million Annuity Fund investment in August 2014.  (PSR ¶ 39).  Rechnitz later testified that he had firsthand knowledge of COBA investments with Platinum totaling $15 million (i.e., Rechnitz was not aware of $5 million of the total $20 million that was invested in Platinum by COBA).  (Tr. 681, 736).

In late 2014, when it was time to deliver Seabrook's first kickback payment, Huberfeld told Rechnitz that Seabrook would get only $60,000, rather than the six-figure payment Huberfeld originally estimated, because Platinum had underperformed.  (PSR ¶ 40).  Rechnitz agreed to front the cash payment to Seabrook, and Huberfeld agreed that Platinum would reimburse him.  (PSR ¶ 40).  Rechnitz delivered the payment on December 11, 2014, handing Seabrook, who was sitting in a sport utility vehicle bearing COBA's name, a newly purchased Ferragamo handbag containing $60,000 in cash.  (PSR ¶ 41).  Rechnitz submitted his reimbursement request to Platinum that same day. To conceal the nature of the transaction, Rechnitz submitted a phony invoice purporting to bill Platinum $60,000 for courtside tickets to New York Knicks games.  (PSR ¶¶ 40-41).  Platinum reimbursed Rechnitz three days later.  (PSR ¶ 41).

Platinum ultimately collapsed and lost $19 million of the $20 million COBA had invested. (PSR ¶ 43). The Government has no information suggesting that Rechnitz received any monetary benefits for facilitating the meetings between Seabrook and Huberfeld, or that Rechnitz knew of Platinum's financial instability. (PSR ¶ 43).

## C.  Political Bribery

Rechnitz and Reichberg were introduced to then-mayoral candidate Bill de Blasio's chief fundraiser, Ross Offinger, and promised to back de Blasio financially, through their own individual donations and through substantial fundraising as "bundlers," provided that "anytime we would call with any issues, . . . we would have access, we would have good response, and we expected results." (Tr. 603). Rechnitz and his wife gave de Blasio the maximum amount permitted under the law, and Rechnitz also gave through straw donors, an illegal practice under local election law. (Tr. 604). In addition to accounting for over $100,000 in donations to de Blasio's campaign, Rechnitz gave over $150,000 to political causes de Blasio championed, including the Senate Democrats and the Campaign for One New York, after the election. (Tr. 604, 794; PSR ¶ 29). In return, Reichberg and Rechnitz called upon Offinger. (PSR ¶ 29).

At trial, Rechnitz testified about instances in which he asked Offinger for favorable treatment from the City. Some of these efforts led to Rechnitz getting meetings that the general public would not have expected but still did not achieve the desired ends; others were more successful. (*See* Tr. 605-09 (cataloguing various requests and their outcomes, including securing a delayed deadline for Rechnitz's wife's cousin to close her preschool as ordered by a City department and rectifying a water bill issue at a property affiliated with Reichberg)). Rechnitz also paid for Offinger's stay at a hotel in the Dominican Republic. (Tr. 604).

Rechnitz and Reichberg reached a similar understanding with Robert Astorino, the Westchester County Executive, the chief executive of the most populous county in the state north of New York City. Astorino, who was running for re-election in 2014, accepted some $15,000 in donations from Rechnitz and Reichberg, around which time Astorino helped arrange for the two to be named Westchester County Police Chaplains—a title that came with no clerical responsibilities for Reichberg and Rechnitz, who were not rabbis, but which entitled them to parking placard privileges.[3] (PSR ¶ 30; Tr. 613-14). Rechnitz also paid for all but $1,800 of a nearly $8,000 Rolex Submariner watch for Astorino later the same year. (PSR ¶ 30; Tr. 612-13). Astorino subsequently surrendered that watch to federal authorities. *See In re One Rolex Submariner Watch*, No. 19 Misc. 283 (DLC), Dkt. No. 2.

---

[3] One of the NYPD officers whom Reichberg and Rechnitz bestowed benefits on early in the conspiracy, Steven McAllister, eventually retired from the NYPD in order to take a position as Police Commissioner of the Village of Floral Park, a small municipality just outside of Queens. (Tr. 617). Once there, McAllister appointed Rechnitz and Reichberg to chaplaincy positions in that jurisdiction. (Tr. 617-18). These positions also came with parking placards. (Tr. 617).

Page 6

### D. Other Conduct

During the time of the charged conduct, Rechnitz engaged in real estate transactions through his business, JSR Capital. (PSR ¶ 14). JSR Capital engaged in hard-money lending during the same period of time.[4] (Tr. 737). Rechnitz's hard-money lending business involved making short term loans available to business partners at higher-than-normal interest rates, and recruiting investors—mostly friends and family members—to invest in making those loans with the promise of swift, substantial returns. (Tr. 737). Between 2013 and 2015, Rechnitz recruited investors into two relevant loan arrangements of this type—the alcohol resale business of a Harlem-based restauranteur named Hamlet Peralta, and National Event Company, the sports and concert ticket resale business of Jason Nissen, with whom Rechnitz shared Knicks season tickets. (Tr. 737-40). Rechnitz invested, and got associates of his to invest, in both businesses. (Tr. 737-40). Rechnitz induced his associates to invest through a number of representations, some of which were false. (Tr. 740-41). Among other things, Rechnitz omitted that he was receiving commissions for recruiting them, and he exaggerated his own personal stake in the ventures. (Tr. 740-41).

The effect of these representations was magnified when it turned out that both Peralta and Nissen's businesses were kept afloat by Ponzi scheme tactics. (Tr. 742-43). Rechnitz did not appear to be aware of those frauds—on the contrary, Rechnitz lost money in at least one scheme, and wiretapped conversations between Rechnitz and Reichberg chronicle their frantic attempts to recoup the Peralta investments and do not show that they were aware of the overall fraud. (Tr. 743-44). Nissen's fraud was not discovered until 2017, when Nissen self-reported and surrendered to authorities, and his account did not incriminate Rechnitz. But people whom Rechnitz had lured into investing through misrepresentations and omissions about his own activity lost money, including one particularly egregious instance in which one of Rechnitz's friends lost over $2 million. (Tr. 832, 853-60).[5] Both Peralta and Nissen were prosecuted for fraud in this district, *see United States v. Peralta*, 16 Cr. 354 (KBF); *United States v. Nissen*, 17 Cr. 477 (PAE), and Rechnitz's cooperation touched these cases in ways discussed below.

Finally, when Rechnitz was approached by law enforcement on three occasions in 2015, he was untruthful in responding to questions about his relationships with police officers, Seabrook, and Huberfeld. (Tr. 557-58). Wiretapped conversations reveal efforts on the part of Rechnitz and Reichberg to discuss how to respond to the investigation, and efforts to coach business contacts

---

[4] Rechnitz explained that he understood hard-money lending to be "when you make a loan to somebody at above normal banking interest rates." (Tr. 737).

[5] Rechnitz's inducement, through fraud, of these investments is not an offense to which he pled guilty as part of his agreement with the Government, although he did disclose the conduct in his early meetings with the Government. (*See generally* GX 1601). Rechnitz's agreement immunized him from prosecution for conduct related to the Peralta scheme; the Nissen business was not known to be a Ponzi scheme to either Rechnitz or the Government until 2017, when Nissen self-reported.

Page 7

and family members on how to avoid deepening Rechnitz's problems if contacted. Rechnitz also destroyed a laptop and a phone in an effort to destroy evidence that incriminated him. (Tr. 736).[6]

## II.  Rechnitz's Cooperation

### A.  Initial Cooperation

Rechnitz was not candid when approached by law enforcement on three occasions in 2015. In May 2016, Rechnitz made the decision to cooperate with the Government. Rechnitz ultimately met with the Government over 80 times. Over the course of numerous proffer sessions, Rechnitz spoke openly about his involvement in criminal conduct and expressed remorse for his actions.

### B.  Rechnitz's Trial Testimony

Rechnitz served as a key witness at the trial of Seabrook and Huberfeld before the Honorable Andrew L. Carter, Jr., the retrial of Seabrook before the Honorable Alvin K. Hellerstein, and the trial of Reichberg and Grant before the Honorable Gregory H. Woods. Rechnitz testified over the course of a combined 18 days and endured substantial cross-examination over the course of 13 of those days. Rechnitz's testimony—which involved direct testimony about explicit discussions of the *quid pro quo* agreement he had with Seabrook and Huberfeld, as well as incriminating conversations he had with Reichberg and other NYPD officers—was important.

### C.  Relevant Co-Conspirator Sentences and the Sentencing Guidelines

The Probation Office has calculated Rechnitz's Guidelines range as 87 to 108 months' imprisonment. (PSR ¶ 143). On November 1, 2023, various amendments to the Guidelines took effect, including Amendment 821, which created a new, retroactive two-level reduction in offense level for certain defendants with zero criminal history points. *See* U.S.S.G. § 1B1.10(d), (e), 4A1.1, 4C1.1 (Nov. 1, 2023 ed.). Section 4C1.1 of the United States Sentencing Guidelines applies and, accordingly, the applicable Guidelines range is now 70 to 87 months' imprisonment.[7]

The defendant's co-conspirators have been sentenced.

- On February 8, 2019, Judge Hellerstein sentenced Seabrook to a term of 58 months' imprisonment, to be followed by three years' supervised release, and imposed a $200 mandatory special assessment and $19 million in restitution to COBA.[8] (16 Cr. 467, Dkt. 298).

---

[6] Rechnitz later provided the Government with substantial electronic evidence that incriminated him and others, including a different cellphone, and hundreds of pictures of him, Reichberg, and their police and political contacts.

[7] Amendment 821 did not take effect until after Rechnitz's Presentence Report was prepared.

[8] In an order entered on February 24, 2023, Judge Hellerstein granted Seabrook's motion for a reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A), reducing Seabrook's sentence from 58 months' imprisonment to time served, amounting to approximately 21 months'

- On June 22, 2021, the Honorable Lewis J. Liman sentenced Huberfeld to seven months' imprisonment, to be followed by one year of supervised release, and imposed a $100 mandatory special assessment, $60,000 in restitution to Platinum, and $4,000 in forfeiture.[9] (16 Cr. 467, Dkt. 402).

- On June 13, 2018, Judge Woods sentenced Harrington to a term of two years of probation and imposed a $100 mandatory special assessment and a $5,000 fine. (16 Cr. 468 (GHW), Dkt. 304).

- On May 13, 2019, Judge Woods sentenced Reichberg to 48 months' imprisonment, to be followed by two years' supervised release, and imposed a $400 mandatory special assessment and a $50,000 fine. (16 Cr. 468 (GHW), Dkt. 601).

With respect to the COBA bribery scheme, Seabrook was the most culpable, including because he abused a position of trust, and failed to take responsibility. Huberfeld was less culpable than Seabrook, but more culpable than Rechnitz. Rechnitz, while a key player in the criminal conduct as the middleman between Seabrook and Huberfeld, is the least culpable of the three defendants.

With respect to the NYPD bribery scheme, Rechnitz and Reichberg were arguably more culpable than many of the particular police officers that they recruited and called upon to perform official acts, because Reichberg led, and Rechnitz funded, a scheme to bribe a network of officers. While those officers, unlike Rechnitz and Reichberg, betrayed their duty to the public, none of their individual conduct was as pervasive as the conduct of Rechnitz and Reichberg. Rechnitz was less culpable than Reichberg, whose bribery activities extended at times beyond Rechnitz's involvement and knowledge. Rechnitz's chief contribution was to leverage his personal wealth to provide cash for the scheme.

---

imprisonment. (16 Cr. 467, Dkt. 459). On December 4, 2025, the Second Circuit reversed Judge Hellerstein's judgment with instructions that the case "be reassigned to a new district judge and that the sentence previously imposed on Seabrook be reinstated." *United States v. Seabrook*, No. 23-6279, 2025 WL 3484616, at *3 (2d Cir. Dec. 4, 2025).

[9] On February 12, 2019, Judge Hellerstein sentenced Huberfeld to a term of 30 months' imprisonment to be followed by three years' supervised release, and imposed a $100 mandatory special assessment and $19 million in restitution to COBA. (Dkt. 296). The Second Circuit held that Judge Hellerstein had erred by imposing a restitution order against Huberfeld as if he had been convicted of the bribery scheme. *United States v. Seabrook*, 968 F.3d 224, 236 (2d Cir. 2020). The Second Circuit also concluded that Judge Hellerstein had procedurally erred by applying the Guideline for commercial bribery (30 to 37 months' imprisonment), rather than for fraud (6 to 12 months' imprisonment). *See id.* at 232-35. As a result, the Second Circuit vacated Huberfeld's sentence, reversed the restitution order entered against Huberfeld, and remanded for resentencing. *See id.* at 227. On December 1, 2020, Huberfeld's case was reassigned to Judge Liman.

Page 9

### III.  Assessment of Rechnitz's Cooperation

Under Section 5K1.1 of the Guidelines, the appropriate reduction in a defendant's sentence for his cooperation is determined based on, among other things, "the significance and usefulness of the defendant's assistance," the "truthfulness, completeness, and reliability" of his information, the "nature and extent" of his cooperation, and the "timeliness of the defendant's assistance." As measured by those factors, Rechnitz's cooperation was timely, significant, and reliable. He met with the Government over 80 times and was consistently thorough and helpful. Although he initially lied to law enforcement, once he decided to cooperate, he was forthcoming about his own misconduct and about the misconduct of others.

Rechnitz testified at three trials over the course of a combined 18 days and proved a credible witness who withstood extensive cross-examination. And, as much as his criminal conduct contributed to the corruption by Seabrook and within the NYPD, his cooperation greatly assisted the Government in combatting that same corruption. His substantial assistance thus merits significant credit.

#### 1.  Significance and Usefulness of the Defendant's Assistance (5K1.1(a)(1))

Rechnitz's cooperation was both significant and useful, and it contributed substantially to the vindication of the public's interest in several public corruption and fraud prosecutions.

The Government would not have been able to prosecute *United States v. Seabrook and Huberfeld*, 16 Cr. 467, without facts Rechnitz provided the Government and his eventual testimony at two separate trials. The Government likewise would not have been able to prosecute *United States v. Reichberg, Grant, and Harrington*, 16 Cr. 468 (GHW), which concerned police bribery at executive decision-making levels, without Rechnitz's proffers and testimony at the November 2018 trial. Rechnitz also contributed to the prosecution of *United States v. Villanueva et al.*, 16 Cr. 342 (SHS), involving corruption in the NYPD's gun licensing division. Rechnitz also provided information that aided in the resolution of other cases, including that of two corrupt businessmen with whom Rechnitz and others connected to him had collectively invested millions of dollars. In addition, Rechnitz was prepared to testify at a fourth trial (the trial of Peralta), but ultimately was not needed.

#### a. The COBA Bribery Scheme

Rechnitz's cooperation was essential to the convictions of Seabrook and Huberfeld. The case could not have been charged without Rechnitz's information and testimony. Although the Government was actively investigating the circumstances under which COBA had invested millions of dollars with Platinum, most of the actual contours of the bribery scheme were unknown to the Government before Rechnitz provided them. The personal involvement of Huberfeld, the terms of the understanding between the co-conspirators, and virtually every detail of the events of December 11, 2014—the day Seabrook received a $60,000 bribe payment—were all brought to the Government's attention by Rechnitz in his initial round of proffer sessions. None of these details were memorialized in emails the Government obtained separately via search warrant, and wiretap monitoring on Reichberg's and Rechnitz's phones did not begin until January 2015—after the payoff to Seabrook. The few calls relevant to the COBA bribery scheme after that point, which

the Government played at both Seabrook trials, were sufficiently oblique as to be of limited probative value on their own. Insider information was vital to prosecution of these crimes. Rechnitz provided it, and made the prosecution possible. In particular, Rechnitz's testimony was necessary to establishing basic background and key events of the bribery scheme, including his explicit discussions of the *quid pro quo* agreement with both Seabrook and Huberfeld, Seabrook's agreement to invest COBA's money with Platinum, while remarking that it was time he "got paid," (Tr. 634-37), and the delivery of cash in a Ferragamo bag to Seabrook. Moreover, Rechnitz's information led to the identification of corroborating evidence—surveillance footage, license plate reader information, and the discovery of the Ferragamo bag at Seabrook's house.

Rechnitz testified at both the trial and retrial of Seabrook. In all, across the two Seabrook trials, Rechnitz testified for nine days. Rechnitz's testimony was invaluable to the Government's ultimate ability to secure a conviction at trial against Seabrook. And Rechnitz's testimony at the first trial helped the Government secure a guilty plea from Huberfeld before the retrial.

Rechnitz's assistance helped hold responsible a powerful union leader and a hedge fund founder who both engaged in a bribery scheme involving betrayal and dishonesty.

### b. NYPD Bribery Scheme

Rechnitz's cooperation was similarly important to the prosecution of the NYPD bribery scheme. The bribery conduct at issue occurred over the course of more than seven years. Rechnitz provided information that enabled the Government to find corroboration for individual incidents, made the Government aware of new incidents, and provided credible evidence of the *pro* between the things of value he and Reichberg gave to officers and the acts those officers performed in return. In particular, Rechnitz provided a first-hand account of conversations he had with Reichberg that evinced the criminal understanding between the two that formed the backbone of the conspiracy.

Prior to trial, on March 1, 2018, Harrington pled guilty before Judge Woods to misapplication of resources in connection with a program receiving federal funds, in violation of Title 18, United States Code, Section 666(a)(1)(A), a felony offense. (16 Cr. 468 (GHW), Dkt. 137-38 & Mar. 1, 2018 Minute Entry). Rechnitz served as a critical witness at the trial of Grant and Reichberg, conducted before Judge Woods in November 2018 through January 2019. The defense hinged not on whether the transactions had taken place, but on whether the defendants shared the requisite criminal understanding with each other and their other alleged co-conspirators. As a result, a critical component of the Government's presentation of evidence was Rechnitz's testimony. Rechnitz testified over the course of nine days, and endured substantial cross-examination over the course of seven days.

The trial concluded with a split verdict: conviction on nearly all counts for Reichberg, and acquittal for Grant.[10] Rechnitz's testimony proved essential to securing Reichberg's conviction. As noted above, Reichberg had engaged in a far-reaching scheme to bribe some of the highest-

---

[10] Reichberg was found not guilty of a single bribery count specifically limited to his interactions with Grant.

ranking members of the NYPD, along with other public officials, for at least eight years. In exchange for bribes, Reichberg demanded and often received a wide range of official actions, including the deployment of NYPD cars, boats, and helicopters to serve himself and his associates; influence over personnel transfers and promotions; favorable dispositions on arrests; police interference in ordinarily civil disputes; and more. While Grant was ultimately acquitted by the jury, the verdict did not appear to reflect any determination about Rechnitz's credibility. Rechnitz's testimony, while critical, was one piece of evidence in a complex, two-month-long trial, which required the jury to weigh numerous factors in assessing each defendant's guilt. Rechnitz fulfilled his responsibility to testify truthfully when called, irrespective of the outcome. As noted above, Judge Woods sentenced Reichberg to 48 months' imprisonment in May 2019. Harrington, who was less culpable than Reichberg and Grant, received a noncustodial sentence for his crime, but nevertheless carries a federal felony conviction for the crime that ended his career as a once highly decorated NYPD official.

Rechnitz's cooperation helped the Government hold accountable Reichberg and NYPD leaders for their participation in a brazen bribery scheme.

### c. Additional Cooperation

Rechnitz's information with respect to his and Reichberg's involvement with Offinger and de Blasio's campaign was also useful. That information constituted some of the conduct at issue in a broader inquiry as to circumstances in which de Blasio and others solicited donations from individuals who sought official favors from the City, after which de Blasio or individuals working for him made or directed inquiries to relevant city agencies on behalf of those donors. While the investigation ultimately concluded without charges, Rechnitz's information was generally corroborated by other evidence uncovered during the investigation, including the accounts of other witnesses.

Rechnitz also provided assistance that helped the Government in connection with *United States v. Peralta*, 16 Cr. 354 (KBF). Peralta solicited more than $12 million from various investors by falsely representing that the funds would be used to purchase wholesale liquor for resale, with the profits to lead to high rates of return for the investors. In truth, Peralta used no more than $700,000 to purchase alcohol, and the rest of the money was used either to repay other investors or enrich himself. Rechnitz—both a victim of the fraud and recruiter of other victims under false pretenses—provided information and emails that assisted the Government in understanding how Peralta's business worked. He was scheduled to testify at Peralta's trial as part of his cooperation, and met with the Government to prepare for that testimony. Peralta pled guilty four days before the start of trial. At the time that Peralta pleaded guilty, Rechnitz's 3500 material had been provided to Peralta. Peralta was sentenced to five years' imprisonment.

After the National Event Company's $70 million resale ticket fraud was uncovered, and owner Nissen was arrested, Rechnitz provided information concerning his understanding of how Nissen's business worked. Nissen pled guilty to the wire fraud charge contained in an information in *United States v. Nissen*, 17 Cr. 477 (PAE). After Nissen's plea, the Honorable Paul A. Engelmayer ordered the Government to undertake an investigation of whether the defendant or persons close to him received a personal financial benefit from the funds that Nissen had

fraudulently obtained, as opposed to money that had gone to business expenses and/or the repayment of other investors. As part of his cooperation, Rechnitz provided information to the Government that assisted with that aspect of the investigation. Nissen was ultimately sentenced to 27 months' imprisonment.

Finally, Rechnitz's cooperation assisted the Government with prosecutions related to the NYPD's Licensing Division, the bureau that vets and approves handgun permits in New York City. Rechnitz provided the Government with information regarding how Grant had used his contacts at the NYPD's Licensing Division—including Sergeant David Villanueva—to attempt to smooth the path for approval of his and Reichberg's gun licenses. After Grant and Reichberg were arrested for, among other things, gun permit-related misconduct, Villanueva and other Licensing Division personnel who had previously accepted bribes from corrupt expediter Alex "Shaya" Lichtenstein decided to stop accepting Lichtenstein's bribes. Lichtenstein attempted to reach out to new "partners" in the NYPD, one of whom contacted the relevant authorities immediately. This launched a broader inquiry that resulted in the arrests and convictions of Villanueva, Lichtenstein, and numerous other corrupt police officers and expediters. *See United States v. Lichtenstein*, 16 Cr. 342 (SHS) (32 month sentence after guilty plea on bribery charges relating to serial bribery of Licensing Division officers); *United States v. Villanueva*, 16 Cr. 342 (SHS) (four month sentence for cooperating police official who received bribes); *United States v. Ochetal*, 16 Cr. 342 (SHS) (time served for police officer who received bribes and testified at trial as cooperator); *United States v. Chambers*, 17 Cr. 396 (WHP) (one year and one day sentence for corrupt attorney who facilitated gun license bribes); *United States v. Dean*, 17 Cr. 398 (ER) (18 month sentence for participation in gun license approval-related bribery); *United States v. Espinel*, 17 Cr. 398 (ER) (one year and one day sentence for participation in gun license approval-related bribery); *United States v. Valastro*, 17 Cr. 398 (ER) (time served for expediter who received bribes); *United States v. Soohoo*, 16 Cr. 342 (SHS) (sentence of time served for corrupt gun license expediter).

### 2. Truthfulness, Completeness, and Reliability of Information and Testimony (5K1.1(a)(2))

As noted above, Rechnitz was not candid when first approached by law enforcement. He lied in order to obfuscate his connections to Seabrook and the NYPD officers he and Reichberg had cultivated. Once Rechnitz decided to cooperate, he gave information both on previously known subjects of investigation and on subjects that were new to the Government. The information he provided was corroborated by other evidence, including the statements of others. Rechnitz was forthright about his crimes and those of others, accepted responsibility for his conduct, and did not minimize or shift blame.

Rechnitz answered questions honestly, both during meetings with the Government and during direct and cross-examination. Rechnitz also provided the Government with considerable evidence that it was able to use during its prosecutions, including documents and dozens of pictures of himself and co-conspirators and persons of interest. He turned over, and the Government made use of, videos he recorded of himself and Reichberg, including on the Christmas morning when they delivered video game systems and high-end collectible dolls to police officers' homes, and the various parking-related credentials that he had received from Banks and others. He made tens

of thousands of emails available to the Government, which tracked many of the schemes that were eventually charged, as well as the full contents of a cellphone.

### 3.  "[N]ature and extent" of Assistance (5K1.1(a)(3))

Rechnitz's cooperation was extensive.  He met with the Government over 80 times, usually for hours at a time, for debriefings and trial preparation.  Rechnitz made himself available to the Government whenever he was requested to do so, without complaint.

Rechnitz's trial testimony exemplifies the extensive nature of his cooperation.  As noted, he testified over the course of 18 days at three separate trials, including intense cross-examination by multiple lawyers over multiple days.

Rechnitz kept his composure throughout his time on the witness stand.  He answered the defense attorneys' questions to the best of his recollection, conceding a point when appropriate and pushing back when not.

### 4.  Any Injury Suffered, or Any Danger or Risk of Injury to the Defendant or His Family Resulting from Assistance (5K1.1(a)(4))

It is inherently risky for a criminal defendant to cooperate with the Government, particularly where his cooperation involved an extensive scheme and implicated defendants in positions of power, including law enforcement officers and a union leader.  Rechnitz experienced harassment as a result of his cooperation.  In the weeks before he was scheduled to testify at the first trial of Seabrook and Huberfeld, Rechnitz reported, and the FBI verified, that (1) Rechnitz was approached in a hostile manner by an associate of Huberfeld at a school event Rechnitz attended for one of his children, (2) Rechnitz's residence was shadowed by a vehicle on multiple occasions, the owner of which traced back to persons with connections to Huberfeld, and (3) both before and after his testimony, Rechnitz received several unsettling anonymous phone calls and emails.

Moreover, the trials at which Rechnitz testified were closely and widely covered by news media, magnifying the reputational impact of Rechnitz's testimony significantly.  (*See, e.g.*, PSR ¶ 57 ("The defendant was ostracized by his Jewish Orthodox community in New York City and ridiculed by the New York City media, particularly the New York Post, for working with the Government.")).  Rechnitz had stressful experiences in testifying.  For example, at different points during Rechnitz's testimony in the Reichberg trial, Judge Woods had to admonish the gallery not to "intimidate witnesses" or engage in "outbursts, laughter, [or] commentary toward the witness or during their testimony."  (Reichberg Tr. 2718-19, 2983, 2994, 4003, 4282).  On several occasions early in Rechnitz's testimony, his efforts to exit the courtroom were impeded by Reichberg's supporters who stood in his way; eventually, Judge Woods permitted Rechnitz to take his breaks in a separate room within the Court's space in order to avoid a potential confrontation. (Reichberg Tr. 2581).

Page 14

### 5. Timeliness of the Defendant's Assistance (5K1.1(a)(5))

In May 2016, Rechnitz made the decision to cooperate with the Government. Rechnitz then sat for three full day-long debriefing sessions with the Government to describe his crimes. Rechnitz's timely assistance was highly important to the Government and helped the Government prosecute the various cases detailed above.

## IV. Conclusion

In light of the foregoing, Rechnitz's assistance was "significan[t] and useful[]" to the Government in its investigation and prosecution of numerous public corruption and fraud defendants. *See* U.S.S.G. § 5K1.1(a)(1). The information provided by Rechnitz was also "truthful[], complete[], and reliab[le]." *See id.* § 5K1.1(a)(2). Accordingly, assuming that Rechnitz continues to comply with the terms of his cooperation, and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines, that the Court sentence Rechnitz in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: s/_____
Lara Pomerantz
Assistant United States Attorney
(212) 637-2343

cc: Noam Biale, Esq.

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

UNITED STATES OF AMERICA                :

   -v.-                                         :

JONA RECHNITZ,                          :        16 Cr. 389 (AKH)

                                              :

              Defendant.            :

                                              :

-------------------------------------------------------------------x

## THE GOVERNMENT'S MEMORANDUM IN SUPPORT OF A DOWNWARD DEPARTURE PURSUANT TO SECTION 5K1.1 OF THE U.S. SENTENCING GUIDELINES AND GENERAL SENTENCING MEMORANDUM

 

                              GEOFFREY S. BERMAN
                              United States Attorney
                              Southern District of New York
                              Attorney for the
                              United States of America

Martin S. Bell
Russell Capone
Jessica Lonergan
Lara Pomerantz
Kimberly J. Ravener
Assistant United States Attorneys
- Of Counsel -

I.   **PRELIMINARY STATEMENT**

Jona S. Rechnitz is to be sentenced on November 1, 2019.  The Government respectfully submits this writing to advise the Court of the pertinent facts concerning the assistance that Rechnitz rendered in the investigation and prosecution of numerous public corruption and fraud defendants.  In light of these facts, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the United States Sentencing Guidelines, for the Court to sentence Rechnitz in light of the factors set forth in Section 5K1.1(a)(1)(B)(5) of the Guidelines.

When the Government so moves at the sentencing proceeding, it will do so with particular enthusiasm.  Since making the determination to cooperate fully with the Government in the spring of 2016, Rechnitz has been, without exaggeration, one of the single most important and prolific white collar cooperating witnesses in the recent history of the Southern District of New York.  By every metric by which one measures a cooperating witness, Rechnitz has been both extraordinary and exemplary.  His assistance has been of extraordinary value.  He has performed and, as set forth below, endured in exemplary fashion as a testifying witness.  And he has adhered to his end of an agreement with the Government that requires him to be truthful and law abiding at all times.

It is worth, even in this preliminary statement, addressing each of these elements of Rechnitz's cooperation more fully.  First, his assistance substantially aided the Government in the investigation and prosecution of numerous, significant public corruption and fraud cases, including the successful prosecutions of the

1

former president of New York City's correction officers' union, the co-founder of a New York-based hedge fund, the former Executive Officer of the Chief of Department's Office in the New York City Police Department ("NYPD"), a former regional appointed municipal chaplain and self-styled liaison to the NYPD, a former Harlem restauranteur, and the chief executive of a national sports ticket resale company.  His work separately although less directly contributed to a vital investigation and set of prosecutions of corrupt individuals within the NYPD's Gun Licensing Division, a unit charged with approving civilian gun permits that, in the wake of Rechnitz's cooperation and the prosecutions that followed, has undergone sweeping and needed reforms.

Second, Rechnitz performed superbly as a witness.  He testified at three high-profile trials, during which he endured the active enmity of the gallery, the scrutiny and, often, ridicule of the local media, and harassment from within his community. He was subject to literally weeks of cross-examination by attorneys, including some of the leading lights of the criminal defense bar, whose objective was nothing short of turning him inside out and exposing every suspect pocket of his life to the harshness of daylight.

And throughout his cooperation, the information he has provided has been truthful, candid, and corroborated by other evidence, and he has otherwise adhered scrupulously to the terms of the agreement he signed with the Government.  He has participated with the Government in over 80 discrete meeting sessions since his cooperation commenced in 2016, the majority of which required him to travel to

New York City from his home on the West Coast, which he did without reimbursement or complaint.

The Government is mindful that Rechnitz was in a position to cooperate regarding a broad range of subject matters in part because, for several years beginning when he was 26 years old in 2008, Rechnitz rode a wave of unbridled ambition and a seemingly limitless sense of entitlement through a series of misdeeds.  Rechnitz had been a brazen criminal, and the seriousness of his crimes of conviction cannot, and should not, be minimized.  Having been introduced to the world of municipal bribery by Jeremy Reichberg, a Borough Park community figure who had already cultivated extensive corrupt relationships with police officers for his own personal purposes, Rechnitz married his substantial personal means to Reichberg's eye for opportunities to cozy up, through illicit means, to those who occupy New York's corridors of power.  The Court, having heard Rechnitz's testimony on this score at the second trial of Norman Seabrook, is familiar with what followed.  Rechnitz and Reichberg engaged in a number of behaviors that blew clear past the line into illegality and others that, at best, were severely distasteful and tiptoed right up to that line.  Reichberg and Rechnitz bribed high-level members of the NYPD in exchange for police action as opportunities arose, a scheme that came to include the highest ranking uniformed officer in the Department.  Rechnitz facilitated a kickback arrangement between Seabrook, the union leader, and Murray Huberfeld, a well-heeled friend who was affiliated with a respected but, unbeknownst to the public, troubled hedge fund.  Rechnitz and

3

Reichberg made ethically and legally dubious forays into political fundraising, meeting separately with the Westchester County Executive and a representative for the future Mayor of New York City and securing from each a pay-for-play understanding with respect to political donations and future municipal action. Rechnitz violated local election law by using straw donors to raise money in the city election. He lied in the course of soliciting investors to certain of his business ventures, lied in order to qualify for both a gun permit and personal health insurance, and lied in order to gain parking privileges to which he was not entitled.

The list of transgressions, as Rechnitz himself has ruefully acknowledged on numerous occasions while meeting with law enforcement, was both stupefying and senseless. But in May 2016, Rechnitz made the decision to accept responsibility for them and cooperate with the investigation. Despite having not been charged with any crimes to that point, Rechnitz initially sat for three full day-long debriefing sessions with the United States Attorney's Office to catalogue his misdeeds. He did so faithfully, accurately, and thoroughly, beginning a series of literally dozens of proffer sessions with the Government. These sessions were the backbone of a process of fruitful and inarguably successful cooperation that lasted more than three years. More than simply fueling a boom of related prosecutions, Rechnitz's cooperation exposed the sordid underbelly of multiple New York City institutions, exposed serious crimes, and held powerful people who fell short of their obligations to the broader public to account.

Rechnitz's importance to those resulting prosecutions cannot be overstated. The Government would not have been able to prosecute *United States* v. *Norman Seabrook and Murray Huberfeld*, 16 Cr. 467 (AKH) without facts Rechnitz provided the Government and his eventual testimony at two separate trials. The Government would not have been able to prosecute *United States* v. *Reichberg, Grant, and Harrington*, 16 Cr. 468 (GHW), which concerned police bribery at executive decision-making levels, without Rechnitz's proffer and testimonial contributions to its November 2018 trial. Rechnitz also contributed significantly to the prosecution of *United States v. Villanueva et al.*, 16 Cr. 342 (SHS), involving corruption in the NYPD gun licensing division. Rechnitz also provided information that aided in the resolution of other cases, including that of two corrupt businessmen with whom Rechnitz and others connected to him had collectively invested millions of dollars, and was prepared to testify at a fourth trial. As set forth in greater detail below, Rechnitz also provided facts that could have given rise to other major public corruption prosecutions. To the extent the other cases did not develop, that reflects no fault of Rechnitz in his role as a cooperating witness, but rather challenges inherent in bringing such cases due to the state of the governing law and other issues surrounding the individual cases. In sum, Rechnitz was an indispensable contributor to a number of major prosecutions and investigations brought by the Government.

We write to provide the Court with the Government's assessment of the defendant's cooperation, violations of law, and any incidents of misconduct since he

5

began his cooperation – of which there were none. We also will convey our assessment of how Rechnitz compares to other cooperators with whom we have worked in terms of the value and extent of his cooperation. On that scale, we rate Rechnitz's cooperation as exceptionally valuable and deserving of great weight in the determination of his sentence.

Rechnitz's cooperation, and overall case, defy easy comparison in the recent history of this Office. One useful and important data point that one can apply is that of Todd Howe, whose information led to the prosecution of the Governor of New York's right-hand associate in *United States* v. *Joseph Percoco*, 16 Cr. 776 (VEC), and New York State's one-time highest-paid public employee, former SUNY Polytechnic President Alain Kaloyeros, in *United States* v. *Alain Kaloyeros*, 16 Cr. 776 (VEC), among others, in separate corruption trials. Like Rechnitz, Howe had a substantial array of criminal baggage. He pled guilty to an Information that charged him with three separate criminal schemes: (i) participation in a bribery and honest services fraud scheme involving Percoco, (ii) participation in a conspiracy, along with Kaloyeros and several real estate executives, to rig government contracts for large New York State economic development projects in Western New York, and (iii) embezzlement from his employer and related tax evasion. Howe also engaged in various smaller-scale frauds and deceptions, from refusing to pay vendors to double-billing clients on travel expenses to depositing an empty envelope into an ATM machine and then falsely claiming to the bank that the envelope had contained a $45,000 check (which conduct had resulted in a previous guilty plea).

Unlike Rechnitz, Howe testified at only one trial because of a revelation – made during his cross-examination at the Percoco trial – that, while cooperating, he had made suspect challenges to credit card charges in an attempt to obtain reimbursement for a hotel stay and transportation.  The Government, in an abundance of caution, sought Howe's remand after this revelation, and he was incarcerated on consent.  He remained in jail for the next five months as the *Percoco* and *Kaloyeros* trials continued – the latter taking place without Howe's testimony because of the damage stemming from those new facts.  Howe was released after five months, and subsequent investigation showed that Howe's credit card activities, while reckless, were not necessarily criminal.[1]

At Howe's sentencing, the Honorable Valerie E. Caproni, United States District Judge, imposed a sentence of time served (*i.e.*, five months) with five years' probation.  Judge Caproni noted the seriousness of Howe's public corruption offenses, and further noted that Howe had "live[d] a life of one fraud after another in the years leading up to the case."[2]  But she also heavily weighed that Howe had taken responsibility for his crimes, unlike the defendants he testified against, and been a useful cooperator notwithstanding the self-inflicted damage caused by the credit card charges.  Given Howe's checkered past, Judge Caproni determined that the Probation Office's recommendation of three years' supervised release might not be "sufficient time to ensure that the habits that Mr. Howe is building are entirely

---

[1] *United States* v. *Todd Howe*, 16 Cr. 632 (VEC), April 5, 2019 Sentencing Transcript (attached as Exhibit A), at 29-30.
[2] *Id*. at 31.

internalized." Accordingly, she suspended the submission of sentence and placed the defendant on five years' probation – as opposed to supervised release – so as to be able to hold the full weight of his potential sentence over him were he to stray and violate the terms of his probation.[3]  This was important because of Howe's near-brush with crime even while cooperating.

Rechnitz differs from Howe in several material respects.  First, Howe committed his series of offenses largely in his forties and fifties after an already successful career in government and lobbying.  While no excuse, it is undoubtedly relevant that Rechnitz began his hubristic foray into corruption in his twenties, early in his professional life and motivated by the need to be successful and important.

Second, Rechnitz's cooperation was *more* helpful – it led to a broader array of successful public corruption prosecutions than Howe's.  He also testified at *three* vigorously contested trials and his testimony spanned over a month in total, whereas Howe testified at one trial over parts of two weeks.

Third, unlike Howe, Rechnitz's cooperation was unblemished.  He successfully adhered to the conditions of his agreement with the Government, and did not damage his own utility as a witness for more than three years.  In every respect, Rechnitz can be described as a more productive cooperator than Howe, his most proximate peer in prior misbehavior.  Moreover, as discussed further herein,

---

[3] *Id.* at 34.

Rechnitz has to endure numerous unusual conditions that distinguish him from most cooperating witnesses.

Rechnitz may also be compared to David Villanueva, another cooperating witness and perhaps *the* major figure in the NYPD gun license scandal in connection with which Rechnitz provided information.  Villanueva pleaded guilty to a five-count information detailing approximately four different corrupt schemes to dole out gun licenses while a sergeant at the NYPD.  In exchange for gifts and tens of thousands of dollars in cash, Villanueva approved hundreds of gun license applications, renewals for those applications, and requests to upgrade licenses to full concealed carry licenses for individuals regardless of their need for a gun license – and in some cases despite significant red flags that made those individuals inappropriate candidates to traverse the City of New York with concealed weapons.

Like Rechnitz, Villanueva cooperated extensively and successfully.  He provided information that led to the prosecution of two NYPD colleagues and other corrupt gun license expediters; testified at two trials; and had an unblemished record during the course of his extensive cooperation.  Unlike Rechnitz, Villanueva was a public official, and to that extent should have been held to a still higher standard.  Villanueva's crimes were arguably as serious as or more serious than Rechnitz's – his level of culpability, given his status as a police officer, was, on some level, higher.  Villanueva's cooperation was comparable, but somewhat less extensive than Rechnitz's.  Villanueva was ultimately sentenced to four months in prison, largely on account of his cooperation, by the Honorable Sidney H. Stein.

9

Sentencing courts are confronted, in cases involving successful cooperators, with fundamental questions.  Among these are to what degree a just sentencing outcome must recognize years of wrongdoing that took place before what is often substantial, even laudable cooperation.  As to Rechnitz, the Government respectfully submits that Rechnitz's cooperation has been of a caliber such that, if genuine leniency is ever available, it should be available in this case.  This Court and others sentenced certain of Rechnitz's co-conspirators in a way that reflects the seriousness of the offenses and the need to deter the population from going down a similar path.  The crimes, as detailed below, merited that message.  But to the extent that the governing statutes require that the sentence *also* must consider the "history and characteristics of the defendant," it must consider the superlative work Rechnitz has done to begin to make things right and see his cooperation through.

And perhaps most profoundly here, to the extent that the same provisions require a sentence that "promote[s] respect for the law," the sentence should reflect Rechnitz's having come forward, taken responsibility, and cooperated fully with the Government.  Indeed, in a case involving a highly visible cooperator as this one, it is absolutely vital that the message be sent to the next potential cooperating witness in a hard-to-prosecute corruption investigation that courts will heavily count their willingness to come forward in resolving their sentences.

The Government therefore respectfully submits that the principal consideration that drives Rechnitz's sentence should be his cooperation, and the need to promote respect for law by not discouraging similarly situated cooperating

10

witnesses from coming forward.  Accordingly, the Government respectfully moves for a downward departure pursuant to Section 5K1.1 of the Guidelines.

## II.  <u>RECHNITZ'S CRIMES OF CONVICTION AND RELATED BAD CONDUCT</u>

As this Court heard during Rechnitz's testimony at the retrial of *United States* v. *Norman Seabrook* (hereinafter "*Seabrook II*"), Rechnitz was, in 2008, a young, upstart real estate businessman from Los Angeles who had moved to New York to begin his career.  At around this time, he met Jeremy Reichberg, a self-styled community organizer and self-appointed liaison between the Orthodox Jewish community in Borough Park, Brooklyn and local law enforcement.  Reichberg was a so-called "expediter" who dealt principally in assisting people in his community in their dealings with various local government entities, including the police.  Reichberg already had years-long relationships with various on-the-rise NYPD officials.  Within weeks of their meeting, Rechnitz joined Reichberg in providing occasional meals and donations to the NYPD Football Team at the behest of several well placed officers.  And they would ask those officers for occasional favors, such as arranging for a police escort through the Lincoln Tunnel for Rechnitz's boss.

From this beginning developed the first of a number of ultimately corrosive and criminal relationships between Rechnitz, then in his 20s, and older, much more established men.  At earlier proceedings, this Court accurately characterized Norman Seabrook's accepting a bribe payment to betray his union as a crime of

hubris and Murray Huberfeld's furnishing that bribe so as to buoy the hedge fund he had started as a crime of greed. For his part, Rechnitz's crimes appear to have chiefly been crimes of ambition. Rechnitz saw ways to cozy up to the established and powerful – a seemingly infinitely connected community activist, a series of powerful police officers, one of the city's most powerful union leaders, a hedge fund magnate, the Westchester County Executive, New York City's Public Advocate and eventual Mayor – in order to make himself look impressive to others and to become established and influential himself. He had a ready-made mentor in building such relationships in Reichberg, who himself sought to monetize the same relationships as an expediter.

### A. The Advanced Stages of the Police Bribery Scheme

Between 2013 and early 2015, Rechnitz and Reichberg escalated their criminal activity significantly. Several developments fueled this intensification. First, several of the police officers whom Rechnitz and Reichberg had built relationships with ascended to positions of power. Michael Harrington, whom Reichberg had known for years, became the Executive Officer to the Chief of Department. Through this relationship, Rechnitz and Reichberg came to lavish gifts upon, and develop a relationship with Harrington's new boss and the highest ranking uniformed officer in the NYPD, Philip Banks. James Grant, a former Brooklyn captain, rose through the ranks such that he was eligible for a promotion to Commanding Officer of the Upper East Side's 19th Precinct in Manhattan, a promotion that Reichberg and Rechnitz helped secure through their lobbying of

12

Banks and Harrington. The Presentence Report ("PSR") will list an array of other police relationships that Reichberg and Rechnitz cultivated during this period of time, but the positioning of Banks, Harrington, and Grant in 2013 through 2014 led to the greatest number of opportunities to lavish gifts on high-level officers and receive favors for themselves, their friends and associates, and their business clients.

The list of the favors and gifts known to the Government, in large part thanks to Rechnitz's cooperation, is long. Among other things, Reichberg and Rechnitz provided officers with free or nearly free trips to numerous vacation destinations, including Punta Cana, Las Vegas, and Los Angeles, and to sporting events like the BCS National Championship Game in Florida – sometimes on private jets, and usually at luxury hotels. On a few occasions, Reichberg and Rechnitz arranged for prostitutes to be available to the travelers, both in the United States and abroad. Banks received a luxury tour through Israel. Banks and Harrington received thousands of dollars in regular meals at high-end kosher steakhouses in Manhattan. Rechnitz and Reichberg rented out a suite at the Meadowlands for their officer contacts and their families at a New England Patriots – New York Jets game during a brief period when the Jets were competitive enough to make that event a hot ticket. Reichberg steered $70,000 worth of business to a private security business run by Harrington's family and friends, and Rechnitz paid for hotel accommodations for a trip to Chicago Harrington took with family members and friends. Harrington and Banks received expensive hockey and

13

basketball tickets. Rechnitz provided Banks with what amounted to a $20,000 gift disguised as a successful "investment" on his behalf. Grant received numerous home improvements, including new railings and windows, along with luxury lodging during a vacation in Rome. Reichberg and Rechnitz visited three Staten Island-based officers on Christmas day, bearing video game systems and high-end collectible dolls for their children. All told, Rechnitz and Reichberg arranged for some $225,000 worth of gifts to be bestowed on their stable of officers over the life of the conspiracy – the bulk of that accounted for by a handful of larger gifts such as the private jet trips, and most of it concentrated within the 2013-2015 window. In return, Reichberg and Rechnitz received police-related favors, including (i) a parking placard, (ii) Grant's promotion and that of other officers known to Reichberg, (iii) the dispatch of a police boat to a private event Reichberg hosted, (iv) the dispatch of a police *helicopter* to a private event Reichberg hosted, (v) assistance in applying for gun permits they likely were not eligible for,[4] (vi) personal rides in police vehicles (for example, to the airport, with lights and sirens blaring), (vii) favorable treatment to individuals who had been ticketed or arrested in order to

---

[4] As part of their effort to obtain gun permits, Reichberg and Rechnitz got Rechnitz put on the payroll of the diamond business belonging to an associate. Rechnitz did not actually work for the associate, but used his purported employment with a risky business as a partial justification in applying for the firearm license. That application, of course, was fraudulent. Rechnitz also used the diamond company's health care plan to obtain health care for a period of two years instead of setting up a health care plan through his own business. Rechnitz appears to have used the diamond company's health care insurance out of sheer laziness, and it is not believed that he profited significantly, if at all, from using it instead of applying for health insurance for and through his own business entity.

14

benefit Reichberg's business, and (viii) police action in addressing private disputes. In early 2015, some weeks after Banks abruptly resigned from his position as Chief of Department, Reichberg and Rechnitz were recorded on a judicially authorized wiretap, lamenting that they did not get even more for their investment in Banks and Harrington.

The police bribery scheme was serious, not least because wrongdoing of this nature has a real impact on the broader community. Every police officer in New York City takes an oath to "protect the lives and property of all citizens of New York City by treating every citizen with courtesy, professionalism, and respect, and to enforce the laws impartially." And Reichberg and Rechnitz's conduct served to substantially undercut the public's faith in NYPD and its commitment to do those things -- most of all, its commitment to "enforce the laws impartially." Any loss of faith in the police is a tragedy in its own right. It also has ripples on the way that citizens interact with police, and on the way that individual officers view their superiors' conduct and, consequently, their own responsibilities. These costs, while difficult to quantify, are real.

### B. *The Seabrook Bribery Scheme*

A second reason why Rechnitz and Reichberg's criminal activities increased beginning in 2013 is that toward the end of that year, Banks introduced them to his friend, Norman Seabrook, the longtime president of the Correction Officers Benevolent Association ("COBA"). Seabrook was an influential and effective union leader whose compensation was not commensurate with his power. At around that

15

time, Murray Huberfeld, a Rechnitz family friend and the founder of the Platinum Partners hedge fund, voiced to Rechnitz that he was looking for large, institutional investors to recruit to the fund. Rechnitz, in his seemingly boundless quest to become a *macher* by currying the favor of older, more established men, identified a situation in which he could solidify his place within the good graces of two powerful figures at once.

Having presided over *Seabrook II*, the Court knows what happened next. Rechnitz approached Huberfeld and proposed what would ultimately become a long-term bribery scheme that yielded only one bribe payment before law enforcement intervened. Rechnitz then recruited Seabrook to the scheme while they were vacationing in Punta Cana. A criminal understanding congealed as Rechnitz shuttled back and forth between the two in the ensuing days once they returned to the United States. Under the agreed-upon scheme, Seabrook would induce COBA to invest millions of dollars of union money in Platinum Partners, and at the end of each year, Seabrook would receive a kickback based on how well the investment performed.

Over the ensuing months, Rechnitz and Jeremy Reichberg continued to nurture the relationship with Seabrook (including taking him, all expenses paid, on the trip to Israel with Banks), and Seabrook used his considerable influence at the union to steer three investments worth a combined $20 million into Platinum Partners, including $15 million in retirement benefit funds and $5 million in dues money that kept basic operations at COBA online. At the end of the first year,

16

when Seabrook demanded payment, Huberfeld and Rechnitz worked out a scheme in which they would fraudulently induce Platinum Partners into "reimbursing" Rechnitz for $60,000 of dollars in Knicks season tickets Rechnitz had not, in fact, conveyed to Platinum Partners.  Rechnitz would then pay Seabrook the same amount out of pocket -- $60,000 in cash, which he memorably delivered to the union president on December 11, 2014 in a black Salvatore Ferragamo men's handbag.

In early 2015, wiretap conversations show that Reichberg and Huberfeld worked actively to secure more union millions for the fund, while Rechnitz – out of town in Los Angeles, and fresh from having personally disappointed Seabrook with less bribe money than originally expected – faded from an active role in the scheme. Eventually, when Seabrook's activities came under scrutiny as a result of a state court lawsuit, and the investigation into Seabrook became overt, the scheme ended. Months later, Platinum Partners went bankrupt, the apparent result of conduct that was eventually charged in the Eastern District of New York as an unrelated fraud, and $19 million of the $20 million was lost.

Rechnitz did not profit personally from his role in the scheme – he saw the greater long-term benefit in solidifying his place in the confidence of both Huberfeld and Seabrook.  When Huberfeld insisted on providing payment, Rechnitz had him write checks to certain charitable causes to which Rechnitz had attached himself, including his son's school and a charitable organization, the selection of which was inspired by the wife of a friend and prominent New York City attorney who had battled cancer.

17

It bears noting that Rechnitz did not appear to know that Platinum was a fraud, or even that it was a bad investment. Aside from the bare fact of his being a generally sophisticated dealmaker with a financial background of his own, no evidence squarely shows that Rechnitz knew – as e-mails show Huberfeld assuredly did – that Platinum Partners was itself in grave financial danger at the time the scheme was concocted. Similarly, there is no evidence that Rechnitz received warnings that the hedge fund investment was not suitable for a benefit pension plan, akin to the warnings that Seabrook received from his union's attorneys and his from his fellow COBA board members in convincing them to invest.[5] Rechnitz's role was as a facilitator and matchmaker, not someone deeply and consistently involved in the details of the fraud.

But no matter what the outcome of the investment was, or how foreseeable that outcome was, the bribe scheme was a triumph of greed over responsibility, and a serious crime. Rechnitz facilitated the offense knowing that it was wrong and knowing that it would result in Seabrook's betraying the tens of thousands of members of his union.

---

[5] The evidence indicated that at the time the plan was hatched, Rechnitz wanted COBA to invest in the more conservative of the two investment products Huberfeld was offering, presumably in the specific hope that the investment would succeed and the union would be protected, and then he later got notice that COBA had invested in the riskier product buried within an e-mail thread confirming the more significant news that COBA had agreed to place up to $10 million into the fund.

18

*C. Political Bribery*

A third reason why Rechnitz and Reichberg's criminal activity increased in 2013 is that there was an open mayoral election in New York City, leading Reichberg and Rechnitz to seek power in the political realm.  Rechnitz and Reichberg were introduced to then-candidate Bill de Blasio's chief fundraiser, Ross Offinger, and promised to back the mayor financially, through their own individual donations and through substantial fundraising as "bundlers," provided that "anytime we would call with any issues, …we would have access, we would have good response, and we expected results."  (Tr. 603).  Rechnitz and his wife gave de Blasio the maximum amount permitted under the law, and Rechnitz also gave through straw donors, an illegal practice under local election law.  In addition to accounting for over $100,000 in donations to de Blasio's campaign, Rechnitz also, after the election, gave over $150,000 to political causes de Blasio championed, including the Senate Democrats and the Campaign for One New York.  In return, Reichberg and Rechnitz called upon Offinger as foretold.

At trial, Rechnitz testified about instances in which he asked Offinger for favorable treatment from the City.  Some of these efforts got Rechnitz meetings that the general public would not have expected but still did not achieve the desired ends; others were more successful.  (*See* Tr.  605-09 (cataloguing various requests and their outcomes, including securing a delayed deadline for Rechnitz's wife's cousin to close her preschool as ordered by a City department and rectifying a water

19

bill issue at a property affiliated with Reichberg)).  Rechnitz also paid for Offinger's stay at a hotel in the Dominican Republic.

Rechnitz and Reichberg also reached a similar understanding with Robert Astorino, the Westchester County Executive, the chief executive of the most populous county in the state north of New York City.  Astorino, who was running for re-election in 2014 and seen as a rising star in state politics, accepted some $15,000 in donations from the pair, around which time Astorino helped arrange for the two to be named Westchester County Police Chaplains – a title that came with no clerical responsibilities for Reichberg and Rechnitz, who were not rabbis, but which entitled them to parking placard privileges.[6]  Rechnitz also paid for all but $1,800 of a nearly $8,000 Rolex Submariner watch for Astorino later in the same year.  Astorino subsequently surrendered that watch to federal authorities as the investigation of the activities of Rechnitz and Reichberg intensified.

*D. Other Uncharged Acts During the Relevant Period[7]*

Rechnitz's day job during the time of the conduct charged was as a syndicator of real estate deals through his business, JSR Capital.  But during the same period of time, JSR Capital engaged in a side business that also proved problematic, "hard-

---

[6] One of the NYPD officers whom Reichberg and Rechnitz bestowed benefits on early in the conspiracy, Steven McAllister, eventually retired from the Department in order to take a position as Police Commissioner of the Village of Floral Park, a small municipality just outside of Queens.  Once there, McAllister also appointed Rechnitz and Reichberg to hollow religiously oriented positions in that jurisdiction. These positions, too, came with parking placards.

[7] This section refers to conduct that, while uncharged, still bears upon Rechnitz's personal characteristics and is appropriately considered in that way by the Court.

money lending." As Rechnitz explained during his trial testimony, his hard money lending business involved making short term loans available to business partners at higher-than-normal interest rates, and recruiting investors – mostly friends and family members – to invest in making those loans with the promise of swift, substantial returns. (Tr. 737). Between 2013 and 2015, Rechnitz recruited investors into two relevant loan arrangements of this type – the alcohol resale business of a Harlem-based restauranteur named Hamlet Peralta, whom Rechnitz had been introduced to by one of his stable of police officials, Chief David Colon, and National Event Company, the sports and concert ticket resale business of Jason Nissen, with whom Rechnitz shared Knicks season tickets. Rechnitz invested, and got associates of his to invest, in both businesses. Rechnitz induced his associates to invest through a number of representations, some of which were false. Among other things, Rechnitz omitted that he was receiving commissions for recruiting them, and he exaggerated his own personal stake in the ventures.

The effect of these representations was magnified when it turned out that both Peralta and Nissan's businesses were kept afloat by Ponzi scheme tactics. Rechnitz did not appear to be aware of those frauds – on the contrary, Rechnitz lost money in at least one scheme, and wiretapped conversations between Rechnitz and Reichberg chronicle their frantic attempts to recoup the Peralta investments and do not show that they were aware of the overall fraud. Nissen's fraud was not discovered until 2017, when he self-reported and surrendered to authorities, and his account did not incriminate Rechnitz. But people whom Rechnitz had lured into

21

investing through misrepresentations and omissions about his own activity lost money, including one particularly egregious instance in which one of Rechnitz's friends lost over $2 million. (Tr. 832, 853-60).[8] Both Peralta and Nissen were prosecuted for fraud in this district, and Rechnitz's cooperation touched these cases in ways discussed *infra*.

Finally, when Rechnitz was approached by law enforcement on three occasions in 2015, he attempted to "wiggle his way out" of the clear trouble he was in by being untruthful in responding to questions about his relationships with police officers, Norman Seabrook, and Murray Huberfeld. (Tr. 555-58). Wiretapped conversations reveal efforts on his part and Reichberg's to discuss how to respond to the investigation, and efforts to coach business contacts and family members on how to avoid deepening his problems if contacted. Rechnitz also destroyed a laptop and a phone in a somewhat uneven and incomplete bid to destroy evidence that incriminated him. (Tr. 736).[9]

---

[8] Rechnitz's inducement, through fraud, of these investments is not an offense to which he pled guilty as part of his agreement with the Government, although he did disclose the conduct in his early meetings with the Government. (*See generally* GX 1601). Rechnitz's agreement did immunize him from prosecution for conduct related to the Peralta scheme; the Nissen business was not known to be a Ponzi scheme to either Rechnitz or the Government until 2017, when Nissen self-reported.
[9] Rechnitz later provided the Government with substantial electronic evidence that incriminated him and others, including a telephone, and hundreds of pictures of him, Reichberg, and their police and political contacts.

22

## III.   RECHNITZ'S COOPERATION WITH LAW ENFORCEMENT

Provisions (a)(1)-(5) of section 5K1.1 of the United States Sentencing Guidelines provide a non-exclusive list of factors that the Court can consider in determining an appropriate reduction in sentence.  The Government has organized its information regarding Rechnitz's cooperation in light of those enumerated Guidelines considerations.

### A. The Significance and Usefulness of the Defendant's Assistance

Rechnitz's cooperation led to some of the more important public corruption prosecutions in recent years, along with successful prosecutions for fraud. Rechnitz's cooperation also contributed to other important investigations that did not lead to prosecutions, though not for reasons that were at all Rechnitz's fault.

### 1.   Norman Seabrook and Murray Huberfeld

Rechnitz's cooperation led directly to the convictions of COBA's powerful president, Norman Seabrook, and multi-millionaire businessman Murray Huberfeld before this Court.  Seabrook and Huberfeld were initially tried on charges of conspiracy to commit honest services fraud and honest services fraud in connection with the Platinum Partners bribery scheme before the Honorable Andrew L. Carter, Jr.  At the conclusion of that trial, the jury was unable to reach a verdict.  The subsequent retrial presided over by this Court ended with guilty verdicts against Seabrook on both counts.  In between the two trials, Huberfeld pled guilty to conspiring to defraud Platinum Partners of the $60,000 obtained via the false

23

Knicks season ticket invoice in order to reimburse Rechnitz for Seabrook's bribe payment.

Rechnitz's contributions to the Seabrook and Huberfeld prosecutions cannot be overstated. As a fundamental matter, the case could not have been charged without him. Although the Government was actively investigating the circumstances under which COBA had invested millions of dollars with Platinum Partners, most of the actual contours of the bribery scheme were unknown to the Government before Rechnitz provided them. The personal involvement of Murray Huberfeld, the terms of the understanding between the co-conspirators, and virtually every detail of the events of December 11, 2014 – the day Seabrook received his first bribe payment – were all brought to the Government's attention by Rechnitz in his initial round of proffer sessions with the U.S. Attorney's Office, the Federal Bureau of Investigation, and the NYPD's Internal Affairs Bureau. None of these details were memorialized in e-mails the Government obtained separately via search warrant, and wiretap monitoring on Reichberg and Rechnitz's phone did not begin until January 2015 – *after* the payoff of Seabrook. The few calls relevant to the COBA bribery scheme after that point, which the Government played at both Seabrook trials, were sufficiently oblique as to be of limited probative value on their own. Insider information was vital to prosecution of these crimes. Rechnitz provided it, and made the prosecution possible.

Just as Rechnitz's information was needed in order to complete the picture of the bribery scheme at a sufficient level to charge it, and even though Rechnitz's

24

information led to the discovery of helpful corroborating evidence – the surveillance footage, license plate reader information, and the discovery of the Ferragamo bag at Seabrook's house, for example – Rechnitz's testimony was absolutely necessary to prove up the scheme at trial.  In many public corruption cases, there are few genuine factual disputes.  Corruption trials often come down to questions of intent – for example, whether a particular generally agreed upon sequence of events necessarily spells out a *quid pro quo* arrangement as understood in the minds of the participants.  This was the rare case that centered on genuine disputes about whether events actually took place – including whether Seabrook had actually received a luxury men's handbag full of cash at all.  Without Rechnitz's testimony, the Government simply could not have proven that he did.

As it happened, Rechnitz testified against Seabrook twice.  In all, across the two trials, Rechnitz testified for nine days.  At the conclusion of the first trial, published reports indicated the jury was two votes shy of conviction on the bribery conspiracy count.  *See* Whitehouse, Kaja and Laura Italiano, "Norman Seabrook's bribery case declared a mistrial," *The New York Post*, Nov. 16, 2017, https://nypost.com/2017/11/16/norman-seabrooks-bribery-case-declared-a-mistrial/, *last accessed Aug. 31, 2019.*  After the second jury voted to convict, jurors interviewed about the case specifically said that they had found Rechnitz credible.  Juror No. 3 noted that it had been a tough case, but, "The look in [Rechnitz's] eyes said he was broken, so I don't think he was lying anymore."  *See* Brown, Stephen Rex, "Norman Seabrook found guilty on both counts in corruption trial," *The New York Daily*

25

*News*, Aug. 15, 2018, https://www.nydailynews.com/new-york/ny-metro-norman-seabrook-verdict-20180814-story.html, *last accessed Aug. 31, 2019.* Put simply, Rechnitz's testimony was invaluable to the Government's ultimate ability to secure a conviction at trial against Seabrook. And Rechnitz's testimony at the first trial – and the resulting near-conviction of Murray Huberfeld at that point – was key to the Government's ability to secure a guilty plea from Huberfeld before the retrial.

This Court ultimately sentenced Seabrook to 58 months in custody, and Huberfeld to 30 months. These stout sentences were massive signals to the broader community that crimes of betrayal and dishonesty will be taken seriously by the criminal justice system, and the significance of Rechnitz's contributions should be evaluated in light of the achievement that these sentences represented.

At the height of his powers, just before his arrest, Seabrook had been among the most powerful non-elected persons in New York City. Seabrook had come to exert "extraordinary control" over the New York City Correction Department, wielding substantial political clout in Manhattan and Albany alike but also blocking needed reforms in a way that "fed a culture of violence and corruption" at Rikers Island. Schirtz, Michael and Michael Winerip, "At Rikers Island, Union Chief's Clout Is a Roadblock to Reform," *The New York Times*, Dec. 14, 2014, https://www.nytimes.com/2014/12/15/nyregion/at-rikers-a-roadblock-to-reform.html, *last accessed Aug. 31, 2019.* Huberfeld was a titan of industry, having both presided over the Kosher Delight empire and co-founded a once-respected hedge fund at different stages in his career. By virtue of Huberfeld's substantial wealth, he and

his family's foundations were also fixtures within New York City's philanthropic scene. The convictions and sentences of Seabrook and Huberfeld, made possible by Rechnitz's cooperation, sent a resounding message that no one is so powerful as to be above the law.

2.  Jeremy Reichberg, Michael Harrington, and James Grant

Rechnitz's cooperation was similarly important to the prosecution of the police bribery scheme. On the same day that Seabrook and Huberfeld were formally charged, a grand jury in this district returned an indictment in *United States* v. *Michael Harrington et al*, 16 Cr. 468 (GHW), which charged Michael Harrington, the former Executive Officer at the NYPD Chief of Department's Office, former 19th Precinct Commanding Officer James Grant, and Jeremy Reichberg with conspiracy, bribery, and honest services fraud offenses. (Reichberg was later charged, via superseding indictment, with obstruction of justice for attempting to have his brother conceal evidence against him on the day of his arrest.) Prior to trial, Harrington pled guilty before the Honorable Gregory H. Woods to misapplication of resources in connection with a program receiving federal funds, a felony offense. After a two month trial, Reichberg was found guilty of conspiracy to commit honest services wire fraud, honest services wire fraud, conspiracy to commit bribery, and obstruction of justice, and Grant was acquitted of each of the counts he faced.[10]

_____

[10] Reichberg was found not guilty of a single bribery count specifically limited to his interactions with Grant.

As with *Seabrook*, the police bribery case could not reasonably have been charged in the form that it was without Rechnitz. The bribery conduct at issue was a patchwork of individual incidents – identifiable quids and quos – spread out over the course of more than seven years. Rechnitz's information allowed to find corroboration for individual incidents, made us aware of new ones that fit the illegal retainer pattern, and provided credible evidence of the "pro" – the link – between the gifts he and Reichberg gave to officers and the acts those officers performed in return. In particular, Rechnitz provided a first-hand account of conversations he had with Reichberg that evinced the criminal understanding between the two that formed the backbone of the conspiracy. This account elevated the proof from a circumstantial chain of benefits and favors to something more coherent and suitable for prosecution as a common scheme.

Reichberg and Grant faced trial beginning in November 2018 before Judge Woods. From the beginning of trial, the defense hinged not on whether the transactions had taken place, but on whether the requisite shared criminal understanding existed between and among the alleged co-conspirators, including the defendants. As a result, the very backbone of the Government's presentation of evidence was Rechnitz's testimony, a reality reflected in the fact that Reichberg's counsel *alone* cross-examined him for in excess of eight days. In total, Rechnitz testified for 11 days. In the end, the jury convicted Reichberg and acquitted Grant. Reichberg's conviction would not have been possible without Rechnitz's testimony.

The case was extremely important, both in leading to convictions and in its broader ramifications.  In the later stages of the investigation, the NYPD began to take action against some of the involved officers, and then-Police Commissioner William Bratton stated publicly that "you'd probably have to go back to the Knapp Commission days" to find a scandal of this dimension within the annals of the NYPD.  *See* Cohen, Shawn and Bruce Golding, "Bratton admits NYPD corruption scandal is historically bad," *The New York Post*, Apr. 14, 2016, https://nypost.com/2016/04/14/bratton-admits-nypd-corruption-scandal-is-historically-bad/ (last accessed Aug. 31, 2019).  Bratton reasoned that what distinguished this case was its focus on the senior leadership of the department. The revelation of corruption of leadership at the highest levels – women and men who are vetted repeatedly during their ascent through the ranks and who generally adhere most scrupulously to the oath they swear – is a rare event in the NYPD.  It is rare because of the celebrated integrity of the NYPD's leadership, but it is also rare because such schemes are profoundly difficult to prove.  It is particularly challenging to investigate and prosecute such schemes where, as here, they involve somewhat diffuse conduct and a broad set of actors, as the list of police officers implicated went significantly further than Harrington, Grant, and Banks.  And when such schemes are uncovered, and leading individuals are prosecuted and convicted, an important message is sent: that corruption at the police department's upper registers uniquely damages the public's faith in the institution and will not be tolerated.

As for Grant, the trial outcome should not be held against Rechnitz in any way.  Only a subset of the quids and quos pertained to Grant.  Further, experience has taught that convicting individual police officers – men and women who have dangerous and important jobs, and in whom many of us are naturally inclined to invest substantial trust – is difficult, particularly where, as here, the jury heard substantial evidence that aside from the bribery activities described in the indictment and reflected in the evidence and testimony, Grant was an accomplished officer.  Rechnitz was, of course, closer to Reichberg than he was to Grant, and for a substantially longer period of time.  Rechnitz testified, without exaggerating and to the extent that he could, about the sporadic sequence of benefits and favors involving Grant, and the jury found the line between conviction and acquittal somewhere between the unavoidable deluge of information concerning Reichberg and the thinner, but still substantial, amount of information concerning Grant.

None of this should detract from the Court's assessment of Rechnitz's cooperation with respect to the police bribery case.  Judge Woods sentenced Reichberg to 48 months' imprisonment – a substantial sentence on par with this Court's sentences of Seabrook and Huberfeld.  Harrington – a less culpable figure than either Reichberg or Grant – received a favorable plea agreement and a non-custodial sentence for his crime, but nevertheless carries a federal felony conviction for the crime that ended his career as a once highly decorated NYPD official.  And although the jury determined to acquit Grant, the trial brought the unseemly aspects of his conduct as a police official to light, including his assistance in

30

Reichberg and Rechnitz's effort to obtain gun permits, and his receipt of thousands of dollars in travel accommodations and home improvements from the same men. This airing was healthy, and ultimately beneficial to the cause of making the next would-be NYPD bribe taker or bribe giver think twice.

3. The De Blasio Campaign Investigation

Rechnitz's information with respect to his and Reichberg's involvement with Ross Offinger and Bill de Blasio's campaign was also useful. That information constituted some, but not all, of the conduct at issue in a broader inquiry as to circumstances in which Mayor de Blasio and others solicited donations from individuals who sought official favors from the City, after which the Mayor or individuals working for him made or directed inquiries to relevant city agencies on behalf of those donors.

On March 16, 2017, then-Acting United States Attorney Joon H. Kim announced that the investigation would conclude without charges. The decision not to charge should not be interpreted as a determination that Rechnitz was not forthcoming. On the contrary, Rechnitz's information was generally corroborated by other evidence uncovered during the investigation, including the accounts of other witnesses. Rather, as U.S. Attorney Kim noted in a statement released at the time of the declination, the decision not to go forward reflects, among other challenges, "the high burden of proof, the clarity of existing law, […] recent changes in the law, and the particular difficulty in proving criminal intent in corruption schemes where

there is no evidence of personal profit."[11]  None of these factors were under Rechnitz's control.

    4.  The Robert Astorino Fundraising Investigation

Similarly, the Government did not ultimately pursue charges with respect to Rechnitz and Reichberg donations to the Astorino Campaign, Rechnitz's provision of the Rolex watch to Astorino himself, and Rechnitz and Reichberg's appointments at Westchester County Police Chaplains.  And here, too, that is not the result of a determination that Rechnitz's information was not forthcoming.

Here, however, the Government can point to an additional tangible gain from Rechnitz's cooperation.  On or about June 24, 2016, FBI agents were able to take possession of the Rolex watch after serving a subpoena on Mr. Astorino.  On or about June 10, 2019, the Government and Astorio entered into a stipulation wherein Astorino consented to the forfeiture of the Rolex watch to the federal government.  *See In re One Rolex Submariner Watch*, 19 Misc. 283 (DLC), Dkt. No. 2.  That watch, upon the successful conclusion of administrative forfeiture proceedings, will be sold, and the proceeds absorbed into the Department of Justice's Asset Forfeiture Fund, which among other things, pays for the costs associated with forfeiture operations across the department and pays certain general investigative expenses.

---

[11] "Acting United States Attorney Joon H. Kim Statement on the Investigation into City Hall Fundraising," March 16, 2017, https://www.justice.gov/usao-sdny/pr/acting-us-attorney-joon-h-kim-statement-investigation-city-hall-fundraising, *last accessed* Aug. 31, 2019.

5.  Hamlet Peralta

Rechnitz also provided assistance that led to the very first arrest to arise from the investigation, *United States* v. *Hamlet Peralta*, 16 Cr. 354 (KBF). Although not the front page news that the Seabrook or Reichberg prosecutions made, the Ponzi scheme run by Hamlet Peralta was significant in its own right. Peralta solicited more than $12 million from various investors by falsely representing that the funds would be used to purchase wholesale liquor for resale, with the profits to lead to high rates of return for the investors.  In truth, Peralta used no more than $700,000 to purchase alcohol, and the rest of the money was used either to repay other investors or enrich himself.

Rechnitz – both a victim of the fraud and recruiter of other victims under false pretenses – provided information and e-mails that assisted the Government in understanding how Peralta's business worked.  He was slated to testify against Peralta as part of his cooperation, and spent several lengthy sessions with the Government preparing for that testimony.  Peralta then pled guilty four days before the start of trial, obviating the need for Rechnitz's testimony.  At the time that Peralta pleaded guilty, Rechnitz's 3500 material had been provided to him and he was well aware that Rechnitz was about to testify against him.  His conviction, therefore, should be credited, in part, to Rechnitz's cooperation.  Peralta was sentenced to five years' imprisonment.

6.  Jason Nissen

Once the National Event Company's $70 million resale ticket fraud was uncovered, and owner Jason Nissen arrested, Rechnitz provided extensive information concerning his understanding of how *that* business worked.  Nissen pled guilty to the wire fraud charge contained in an information in *United States* v. *Jason Nissen*, 17 Cr. 477 (PAE).  After Nissen's plea, the Honorable Paul A. Engelmayer ordered the Government to undertake an investigation of whether the defendant or persons close to him received a personal financial benefit from the funds that Nissen had fraudulently obtained, as opposed to money that had gone to business expenses and/or the repayment of other investors.  As part of his cooperation, Rechnitz provided information to the AUSAs tasked with that assignment.  Nissen was sentenced to 27 months' imprisonment.

7.  The NYPD's Gun Licensing Division

Rechnitz's cooperation also assisted in a badly needed cleanup at the NYPD's Licensing Division, the bureau that vets and approves handgun permits in New York City.  Rechnitz gave information regarding how Grant had used his contacts at the NYPD's Licensing Division – including Sergeant David Villanueva – to attempt to smooth the path for approval of his and Reichberg's gun licenses.  After the announcement of the arrests of Grant and Reichberg for conduct that included gun permit mischief, Villanueva and other Licensing Division personnel who had previously accepted bribes from corrupt expediter Alex "Shaya" Lichtenstein decided to stop accepting his bribes.  Lichenstein attempted to reach out to new

partners in the NYPD, one of whom contacted the relevant authorities immediately. This launched a broader inquiry that resulted in the arrests and convictions of Villanueva, Lichtenstein, and numerous other corrupt police officers and expediters.

In this way, Rechnitz should also receive some credit for contributing to the Government's successful spin-off investigation of the Licensing Division and the network of expediters who transacted with it. These investigations resulted in the successful prosecutions of *United States* v. *Alex ("Shaya") Lichtenstein*, 16 Cr. 342 (SHS) (32 month sentence after guilty plea on bribery charges relating to serial bribery of licensing division officers); *United States* v. *David Villanueva*, 16 Cr. 342 (SHS) (four month sentence, discussed *supra*, for cooperating police official who received bribes); *United States* v. *Richard Ochetal*, 16 Cr. 342 (SHS) (time served for police officer who received bribes and testified at trial as cooperator); *United States* v. *John Chambers*, 17 Cr. 396 (WHP) (one year and one day sentence for corrupt attorney who facilitated gun license bribes); *United States* v. *Paul Dean*, 17 Cr. 398 (ER) (18 month sentence for participation in gun license approval-related bribery); *United States* v. *Robert Espinel*, 17 Cr. 398 (ER) (one year and one day sentence for participation in gun license approval-related bribery); *United States* v. *Gaetano Valastro*, 17 Cr. 398 (ER) (sentence pending for former officer and expediter who received bribes); and *United States* v. *Frank Soohoo*, 16 Cr. 342 (SHS) (sentence of time served for corrupt gun license expediter).

Rechnitz's cooperation led to an overdue shining of light on a dysfunctional corner of the NYPD, one that has, as a result, undergone substantial reforms and

35

been fully re-evaluated and re-staffed.  In addition, because Villanueva was the corrupt official who Grant used to approve gun licenses for Reichberg and Rechnitz, had Villanueva proceeded to trial, Rechnitz would likely have been called to testify against him.  Ultimately, of course, Villanueva also cooperated, and, as noted above, was ultimately sentenced to four months in prison.

* * *

In conclusion, the significance and usefulness of Rechnitz's cooperation is, perhaps in both its breadth and its depth, without peer among white collar cooperating witnesses in the recent history of the Southern District of New York.  From COBA's union leadership to City Hall, from the Westchester County Executive's Office to One Police Plaza, to two multimillion dollar Ponzi-style schemes, Rechnitz's cooperation reverberated profoundly.  It is difficult to describe precisely how valuable Rechnitz's cooperation was, but may it suffice to say that his assistance fueled a surge in significant and successful investigations and prosecutions between 2016 and the present, and perhaps more importantly exposed a wide swath of wrongdoing and held powerful, wayward interests to account.

### B. The Nature and Extent of the Defendant's Assistance

The Guidelines call upon the Court to evaluate not merely the importance of the defendant's assistance, but also what the defendant actually did in order to provide it.  Here, too, Rechnitz's value was as great or greater than nearly any other recent white collar cooperating witness.  Between 2016 and the present, Rechnitz met or spoke to the Government on more than 80 discrete days that the

36

Government has been able to tally – many of those being full day sessions in conference rooms at the U.S. Attorney's Office of debrief proffers at the outset of his cooperation and full-day prep sessions in anticipation of his testimony at the trials at which he appeared as a witness. When he was not in New York, he was teleconferencing in from Los Angeles. When he was in New York, he was there without complaint. Frequently, Rechnitz would arrive for his sessions with the Government having just disembarked the redeye flight from California. He never asked to be reimbursed for his travel.

Rechnitz's testimony was also remarkable. Rechnitz was called as a witness at three separate trials. At each trial, Rechnitz had to explain to a jury of his peers the various ways in which he had gone astray during the years of his criminal partnership with Jeremy Reichberg. Every distasteful detail had to be presented on direct examination, from his bribery conduct, to his provision of prostitutes for various officers, to his dubious business practices. In a city that takes both religion and parking quite seriously, Rechnitz had to tell jurors how he had made a mockery of his faith by taking on chaplaincy positions he had no qualifications to hold in order to secure a parking placard. Rechnitz had to look those same jurors in the eye and tell them how he referred friends of his to Reichberg in order to skirt *their* obligations to serve as jurors. And so on. In Rechnitz's case, there was a palpable awkwardness as Rechnitz walked them through years of distasteful details of his own life and schemes, a factual cocktail that seemed almost engineered to provoke active disdain from jurors who, unlike the Government, had not seen Rechnitz hold

his head and weep in conference rooms as he bemoaned his foolishly spent younger years.

The direct testimony was, in that sense, difficult.  The cross-examinations were still more so.  Rechnitz's central role at trial was made clear when he was subject lengthy cross-examinations that rehashed the embarrassing already brought out and sought to raise new ones in an effort to discredit him as a witness.  At the first *Seabrook* trial, before Judge Carter, Rechnitz was cross-examined for parts of four days out of a total of six on the witness stand, by some of our district's better practitioners of that art.  At the retrial before this Court, the cross-examination was more economical but no less lacerating as Rechnitz was grilled about friends he had betrayed and ways in which he had attempted to make himself seem more successful and important than he in fact was over the years.  In the Reichberg trial before Judge Woods, Rechnitz's cross-examiners were even more unrelenting, as Rechnitz's cross-examination *alone* went on for more than eight trial days.  Without exaggeration, and largely because his past made it possible, Rechnitz was publicly mocked, harangued, and called names for days on end.  Attorneys went so far as to chastise him for taking one of his children to a baseball game while awaiting sentencing.[12]

The pressure of the testimony was substantially amplified by the attention it received in the media.  As had been the case in the advanced stages of the investigation, Rechnitz's name and picture were front and center in New York City's

---

[12] *See Seabrook I* Tr. at 1206.

tabloid press, amidst breathless, sensationalized and often inaccurate coverage of his past misdeeds.  The following representative examples came the morning after the first hour of Rechnitz's testimony in *Seabrook I*:



Further, at the *Reichberg* trial, Rechnitz testified before a particularly hostile gallery, so much so that Judge Woods had to take action on multiple occasions.  In the Seabrook trials, particularly the first one, the gallery had been merely filled with supporters of the defendants from the community, including numerous members of the defendants' social and professional circles.  Reichberg's trial was another story.  At different points during the Reichberg trial, Judge Woods had to admonish the gallery not to display, in the direction of the witness box, pictures of a rabbi that had been distributed among Reichberg's supporters.  On several occasions early in Rechnitz's testimony, his efforts to exit the courtroom were impeded by men from the community who stood in his way and stared him down;

eventually, Judge Woods granted a Government request to allow Rechnitz to take his breaks in the robing room in order to avoid a physical confrontation.

All of this detail serves a relatively simple point: Rechnitz not only testified at considerable length, but did so under a kind of duress that is atypical of the experience of cooperating witnesses.

## C. *Unusual Circumstances Endured by The Defendant*

In a related vein, the Guidelines ask the Court to consider "any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his cooperation." U.S.S.G. § 5K1.1(a)(4). To be clear, Rechnitz is not in the category of cooperating witnesses who find their lives and those of their families threatened by the violent gang members or narcotrafficking defendants they testify against. But Rechnitz's experience also differed significantly from the average white collar cooperator in several respects that the Court should consider.

First, Rechnitz needed to obtain rabbinical permission in order to even come forward to the Government when he chose to. (*See* Reichberg Tr. at 2716). The Government understands this requirement to have its roots in the religious and cultural notion of *mesirah*, which anchors a prohibition against informing on fellow Jewish persons in the teachings of the Talmud. Bluntly put, when Rechnitz commenced his cooperation, Rechnitz had to deal with the likelihood that significant portions of his community would see him as having shifted from one disgraceful mode of conduct – his lawless conduct alongside Jeremy Reichberg for several years – to an even worse one as a betrayer of his community and faith.

40

Second, Rechnitz experienced actual harassment as a result of his cooperation – particularly in the weeks before he was scheduled to testify against Huberfeld in the first trial. Among other things, Rechnitz reported, and the FBI verified, that (1) Rechnitz was approached in a hostile manner by an associate of Huberfeld's at a school event he attended for one of his children, (2) Rechnitz's residence was shadowed by a vehicle on multiple occasions, the owner of which traced back to persons with connections to Huberfeld, and (3) both before and after his testimony, Rechnitz received several unsettling anonymous phone calls and e-mails. The thrust of some of these communications was not an overt threat to harm Rechnitz or members of his family, but rather an effort to put Rechnitz in a state of guilt-related anxiety about testifying against Huberfeld.

To this end, one of the more chilling instances of harassment involved the leaking of activities within his synagogue to the *New York Post*. On October 4, 2017 – weeks before Rechnitz was due to testify against Huberfeld at the first trial – the Post reported that, according to "sources," Rechnitz and his father gave substantial donations in order to perform certain honors at Yom Kippur services that year, and his fellow congregants resented it. The report also gratuitously named individuals whom Rechnitz had brought to the synagogue as guests in recent weeks. *See* Whitehouse, Kaja, "De Blasio donor angers temple-goers with $30K donation," *The New York Post*, Oct. 4, 2017, https://nypost.com/2017/10/04/de-blasio-donor-angers-temple-goers-with-30k-donation// (last accessed Aug. 31, 2019). To Rechnitz, the disclosure of these private activities to the Post struck him as he imagined they

41

were intended to – as a particularly personal and violating brushback pitch from persons within his own faith community.

All of these atypical wrinkles were layered atop an unprecedented level of media attention.  When news of the investigation into Reichberg and Rechnitz first broke, before anyone had been charged, the topic ran on the front page of the *New York Post* for eight straight days, the first of a number of waves of publicity.  Seemingly each day trumpeted a new angle, many of them salacious – from the involvement of prostitutes to the involvement of high-level NYPD officials and the Mayor of New York.  Rechnitz's name and picture were plastered on every story, and each emphasized the most scandalous details.

Needless to say, Rechnitz reached a level of infamy that is rare even in New York before making a single public appearance in court as a witness, and testified amidst a suffocating media crush.  Rechnitz needed an FBI escort just to get into court.  That attention, of course, gravely affected what legitimate businesses he had, as banking institutions severed their ties to his real estate syndication company and business contacts shunned him.

In sum, Rechnitz testified amidst the collapse of the life he had known, a collapse that was public and prolonged in ways that further distinguish him from other cooperating witnesses.

*D. The Truthfulness, Completeness, and Reliability of Any Information or*

   *Testimony Provided by the Defendant, and the Timeliness of His*

   *Assistance*

As noted earlier, Rechnitz was not candid when first approached by law enforcement. He lied in order to obfuscate his connections to Seabrook and the officers he and Reichberg had cultivated. Once his formal cooperation commenced, however, Rechnitz gave information both on previously known subjects of investigation and on subjects that were new to the Government. The information he provided was corroborated by other evidence, including the statements of others. Rechnitz was at all times forthright about his crimes and those of others, and it is perhaps most telling that over the literal weeks of cross-examination he endured over the course of three trials spread out over more than a calendar year, he was never revealed to have told the Government anything but the truth.

Rechnitz's formal cooperation was sufficiently timely to charge each of the cases referenced herein, and his own charges came pursuant to an already secured cooperation agreement. The Government intends to move, at the time of sentencing, for the Court to award him the "third point" pursuant to U.S.S.G. 3E1.1(b), because he pled sufficiently early for the Government to avoid preparing for trial and allocate its resources efficiently.

In addition to his debriefs and his testimony, Rechnitz also provided the Government with considerable evidence that it was able to use during its prosecutions. Among these were documents and dozens of pictures of himself and

co-conspirators and persons of interest, including the relevant officers, politicians, and other prominent persons.  He turned over, and the Government made use of, video he recorded of himself and Reichberg, including on the Christmas morning when they delivered gifts to police officers' homes, and the various parking-related credentials that he had received from Philip Banks and others.  He made tens of thousands of emails available to the Government, which tracked many of the schemes that were eventually charged, as well as the full contents of a cellular phone.

All told, over the course of the three and one half years of cooperation with the Government, Jona Rechnitz has done virtually everything that the United States Attorney's Office and the law enforcement agencies working with it have asked him to do.

## IV.   OTHER SENTENCING CONSIDERATIONS

### A.  Sentences of Similarly Positioned Defendants

One of the chief reasons that the current sentencing regime, including the Guidelines, exists, is to avoid unwarranted sentencing disparities between similarly situated defendants.   Precise comparators for Rechnitz are rare – it is not every day that one comes across the same combination of (1) prior bad conduct, (2) significant, far-reaching cooperation, and (3) personal toll in undertaking that cooperation. Further, it is generally rare for the Government to successfully develop cooperating witnesses in public corruption cases.

The Government can offer the following data points:

- *United States* v. *Todd Howe*, 16 Cr. 632 (VEC).  Noted *supra*.  Howe, who had committed myriad frauds in addition to the corruption-related crimes of conviction, testified at one trial and experienced a near-detour into criminality that prevented him from testifying at a second.  His assistance contributed to the convictions of Joseph Percoco, Alain Kaloyeros, and several co-conspirator businessmen. Howe was sentenced to probation, having been detained for five months' imprisonment after his cooperation went awry.

- *United States* v. *David Villanueva and Richard Ochetal*, 16 Cr. 342 (SHS).  Also noted *supra*.  Villanueva's assistance, which included testimony at two trials, contributed to the successful prosecutions of Reichberg and several police officers and corrupt expediters.  Villanueva was sentenced to four months' imprisonment.  Ochetal, a lower-ranking officer, cooperated even earlier than Villanueva did, making the latter's prosecution possible, and later testified at the Reichberg trial.  He received a sentence of time served in September.

- *United States* v. *Thomas Gassnola*, 18 Cr. 252 (LAK).  Gassnola cooperated in wide-ranging NCAA corruption scandal, in connection with which he and co-conspirators funneled illicit payments to the families of amateur student-athletes bound for NCAA schools to ensure that the students matriculated at schools sponsored by Adidas, the apparel

45

company.  The scheme involved three different colleges, and plans involving a fourth were thwarted only by the betrayal of one of the co-conspirators.  He pled guilty to wire fraud conspiracy and testified at the trial of three co-defendants last year.  On September 10, 2019, Gassnola was sentenced to time served (e.g., no incarceration) and a one year term of supervised release.

- *United States* v. *Unnamed Cooperating Witness ("Defendant-1").*[13] Defendant-1 participated in a significant bribery and money laundering scheme, and was also understood to have committed tax and embezzlement misconduct, along with failing to disclose required information in another official proceeding.  Unlike Rechnitz, Defendant-1 did not have to testify at trial (although the witness was willing), nor did any charged cases result directly from the cooperation.  Defendant-1 received a sentence of time served with a probationary period.

- *United States* v. *James David Williams*, 16 Cr. 436 (KMW).  Between 2002 and 2016, Williams and his co-conspirators defrauded investors in connection with various film projects and laundered the proceeds, committed aggravated identity theft in furtherance of a separate fraud, made false statements to the Government (necessitating a second guilty plea), and engaged in some 20 years of other petty fraud offenses.  He did

---

[13] The referenced defendant's cooperation is not publicly known, and thus the witness is not named here.  The Government can, at the Court's request, provide the defendant's name and docket number under seal and ex parte upon request.

not testify at trial, although he was willing to do so.  Williams received a time served sentence, having spent 9 months in jail.

B.  Section 3553 Factors

Under the statute, the Court must determine a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and takes into account Rechnitz's history and characteristics, protects the public from further crimes of the defendant, and deters criminal conduct.

The Government notes that it is difficult to imagine Rechnitz offending again. As an initial matter, the publicity that accompanied his case and those he became involved in rendered him radioactive to potential criminal partners.  Most criminals would be highly reluctant to engage in their activities with someone who has already aroused this much attention.  But perhaps more importantly, it is difficult to imagine Rechnitz taking up the same course again given the remorse he has exhibited in proffer sessions with us, and while testifying, regret that goes beyond merely having committed crimes.  When asked whether he was proud of being able to secure the Westchester County Police Chaplain position, Rechnitz was blunt. "Not at all […] I made a mockery of my religion, I made a mockery of the chaplaincy, and it's humiliating." Seabrook II Tr. at 615.  Rechnitz's expressions of regret and embarrassment that he lost his footing on a moral level square with sentiments that he has expressed to us during his prep sessions, and in a fashion that we credit.  They cohere with a viewpoint that he has voiced repeatedly to us

47

and during his testimony – that his lawless adventures in impressing his way up the ladder were stupid, childish, and criminal. Further, Rechnitz has seen his former colleagues in criminality – the people he literally broke bread with while committing these offenses – fall one by one. Rechnitz has been duly deterred.

The cause of *general* deterrence has also been served already by the stout sentences handed to Rechnitz's senior partners in crime, including Reichberg, Seabrook, and Huberfeld. We respectfully submit that the collective impact of this suite of cases has already been to send a message that bribery will not be tolerated. Each of those convictions and sentences received substantial public attention. Here, more so than in most cases, there is reason to believe that general deterrence has already been effected. Likewise, the criminal justice system has expressed its righteous view of the seriousness of the offenses through the other defendants. Jeremy Reichberg, who never took actual responsibility or expressed genuine remorse for his actions, was a key participant in (if not the driving, orchestrating intellect of) the entire crime spree. He has surrendered to the Bureau of Prisons, and will spend the next four years in federal prison. Seabrook and Huberfeld's sentences in the same ballpark reflect their status as the defining poles of one of the more infamous bribery schemes in recent memory.

That leaves the need to promote respect for the law and the need to provide *just* punishment. The Government respectfully submits that a just punishment, in this case, should reflect Rechnitz's extraordinary cooperation. Likewise, promoting respect for the law, in this instance, is more effectively achieved through sending a

48

vital message that the Reichberg, Seabrook, and Huberfeld sentences could not send, a message that speaks directly to the next Jona Rechnitz: that it is always, always worth it to stop digging.  That there is some salvation in attempting to turn things around and committing to set things right.  And that when people make that decision to cooperate, accept responsibility, plead guilty willingly and early, and embark upon a path of redemption, when they both perform extraordinarily in doing so in a process that takes years beyond what is expected of most similarly situated people, a system that values *just* punishment will fully and properly consider all of this in imposing a fair sentence.

This, too, is promoting respect for the law.  This is a message that will encourage rather than dissuade the next potential cooperating witness, and consequently, enable just and right outcomes in cases well beyond even the scope of Jona Rechnitz's cooperation.  It is a message that will send ripples well beyond the world affected by his admittedly serious crimes.  And, crucially, it is a message that can *only* be sent in this case – in which Rechnitz's cooperation has been highly visible, its fruits have been meaningful, and its caliber has been nothing short of historic.

## CONCLUSION

For the foregoing reasons, the Government respectfully moves for a downward departure in sentence, pursuant to Rule 5K1.1 of the Sentencing Guidelines, and further respectfully requests the imposition of a sentence driven

principally by Jona Rechnitz's extraordinary cooperation – a sentence sufficient, but

not greater than necessary, to achieve the statutory goals of sentencing.

Dated: New York, New York
       October 16, 2019

                                   Respectfully submitted,

                                   GEOFFREY S. BERMAN
                                   United States Attorney

                          By:      _____
                                   Martin S. Bell
                                   Russell Capone
                                   Jessica Lonergan
                                   Lara Pomerantz
                                   Kimberly J. Ravener
                                   Assistant United States Attorneys
                                   Southern District of New York
                                   (212) 637-2463/2247/1038/2343/2358

cc:    Alan Levine, Esq.
       Daniel Grooms, Esq.
       Nicholas Flath, Esq.

50

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

     v.               16 CR 389 (KPF)

JONA RECHNITZ,

          Defendant.        Sentence
------------------------------x

                      New York, N.Y.
                      March 20, 2026
                      2:35 p.m.

Before:

          HON. KATHERINE POLK FAILLA,

                      District Judge

            APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  LARA POMERANTZ
    KIMBERLY RAVENER
    Assistant United States Attorneys

SHER TREMONTE LLP
    Attorneys for Defendant
BY:  NOAM BIALE

Also Present:
Julia Sussman, Paralegal

          SOUTHERN DISTRICT REPORTERS, P.C.
             (212) 805-0300

(Case called)

MS. POMERANTZ:  Good afternoon, your Honor, Lara Pomerantz and Kimberly Ravener for the government.

THE COURT:  Good afternoon, and thank you.

Mr. Biale.

MR. BIALE:  Good afternoon, your Honor, Noam Biale for Jona Rechnitz, who is seated to my left, and I am also joined at counsel table by my paralegal, Julia Sussman.

THE COURT:  All are welcome.  Thank you very much.

Mr. Biale, before you sit down, are there individuals in the courtroom that you wish to introduce to me?

MR. BIALE:  Yes, your Honor.  I would like to introduce you to Mr. Rechnitz's father, Robert Rechnitz; his mother, Melanie Rechnitz; and his wife, Rachel Rechnitz, who are seated in the second row on your Honor's right.

THE COURT:  Thank you so much.

Good afternoon to each of you.  I think each of you has given me a written submission in connection with sentencing.  I appreciate that as well.  Thank you.

All right, Mr. Biale.  Many thanks, sir.  You may be seated.

Counsel, as you know, I am the second judge to preside over Mr. Rechnitz's case.

I do hope I have all of the materials I should have for sentencing, but let me tell you what I have.

Right before I do that, let me ask, this is a situation in which I am sometimes asked to seal transcripts. I do not know if this is that case. Given that he has testified in multiple trials, I did not think I was going to be asked, but I figured I didn't want to begin with the proceedings and then be told that I should have asked the question.

Ms. Pomerantz.

MS. POMERANTZ: That's correct, your Honor. We are not asking to seal the transcript.

THE COURT: Thank you very much.

MR. BIALE: I'm not either, without prejudice to changing my mind.

THE COURT: I will appreciate that. If there is something sensitive or personal information, I might allow a limited sealing of that information.

Let me tell you what I have. I have a presentence investigation report that is dated March 23 of 2020. I have a resentencing submission from the defense that was filed on January 14 of 2026, with a number of exhibits to it involving letters from Mr. Rechnitz and others. I then have a letter that was filed from the defense on January 16. I have the government's resentencing submission that was filed on January 21 of 2026.

Thereafter there were a number of submissions in traditional or less traditional formats that I have received.

I believe the parties have seen each of them. We know what they are. There are too many for me to put on the record and therefore I will not. But the parties are aware of materials that I have received in connection with sentencing.

And then most recently I have received a submission from Mr. Biale that is dated March 16 of 2026. I received a submission from the government that is dated March 19 of 2026.

Ms. Pomerantz, from your perspective, is there anything that I'm missing?

MS. POMERANTZ: No, your Honor.

THE COURT: Mr. Biale, the same question.

MR. BIALE: Your Honor, other than I assume that the record of the prior sentencing is incorporated into the record of this sentencing, I specifically -- there were some aspects of that that I attached to my submission which I wanted to draw the Court's attention to. I don't expect that everything has been reviewed. I brought to the attention of the Court the parts that I thought were most salient.

THE COURT: As you know, sir, this resentencing has proceeded in stages because I have first addressed the issue of restitution and then moved from there.

When I was working on that component, I did review, I believe, all of the materials in connection with the original sentencing and substantial components of the trial transcript and other materials. Yes. I have considered those in

connection with sentencing if we expand sentencing to include both components of it.

But you have reminded me of something, sir, that I did want to put out there, not to cut you off but to clarify something for you. I have no intention of using at sentencing or in my decision about the sentence I impose the reduction in restitution value that was occasioned by the first component of this matter. I am aware that the restitution figure was reduced. I'm aware why. I have thought about reasons that I could use to consider it at sentencing and I've thought about reasons why I shouldn't, and ultimately I have determined not to. To the extent that you had arguments that were based on a concern for prior statements that I have made, you need not raise them with me.

MR. BIALE: I appreciate that, your Honor. With that, you have everything that's in the record from our perspective.

THE COURT: Thank you.

Ms. Pomerantz, it was my expectation I should be directing my questions to you. If I should be directing them to Ms. Ravener, please let me know.

MS. POMERANTZ: To me is fine, your Honor.

THE COURT: Thank you so much.

Have you reviewed the presentence investigation report in this case that is dated March 23 of 2020?

MS. POMERANTZ: Yes, your Honor.

THE COURT: I believe the guidelines have to be changed as a result of amendments to the guidelines. And it was not my intention to add a supplement to the PSR that spoke about Mr. Rechnitz's employment history since the last sentencing.

Other than the guidelines changes, do you have any objections to the contents of the report?

MS. POMERANTZ: No, your Honor.

THE COURT: Actually, just before you sit down, there isn't a forfeiture figure per se. There was a restitution figure that I understand to have been paid, correct?

MS. POMERANTZ: I believe that's correct, your Honor.

THE COURT: Given that, does the government have a perspective -- I suppose I could put in the restitution figure and indicate was paid, but there are, for example, two special conditions of supervised release that are imposed in situations where folks have a monetary obligation. Given the fact that that obligation appears to have been fulfilled, do you think that I should still include -- this would be the provision of financial information and the proscription on credit charges or letters of credit unless in compliance with restitution payments. I don't know if those need to be included. That's why I'm asking.

MS. POMERANTZ: May I have one moment, your Honor?

THE COURT: Of course.

MS. POMERANTZ:  Thank you, your Honor.

After reviewing the language relating to the special conditions, it seems that the first one would be applicable relating to providing information to the probation officer in connection with whatever sentence your Honor imposes.  But with respect to the second, which relates to the defendant being in compliance with the installment payment schedule, that perhaps would be less applicable.

THE COURT:  Thank you.

Let me turn then to Mr. Biale.

Mr. Biale, have you and has your client each had an opportunity to review the most recent iteration of the presentence investigation report?

MR. BIALE:  Yes, your Honor.

THE COURT:  Other than the changes to the guidelines, do you have any objections to its contents?

MR. BIALE:  We do not.

THE COURT:  I'm imagining you agree with me that I do not need to do a supplement for his more recent employment history.

MR. BIALE:  Correct.

THE COURT:  Since your client's original sentencing, there have been some Second Circuit cases on the issue of supervised release conditions and, in particular, special conditions of supervised release.  As a result of that, judges

are a little bit more precise and perhaps granular with respect to those conditions.

Have you reviewed the mandatory, standard, and special conditions with your client? And before you answer it, let me say, I know, because I can read, that you do not want me to impose a term of supervised release. But if it turns out that I do, I would like to have these questions resolved at the front end.

MR. BIALE: Understood, your Honor. I did review them with him quite sometime ago. I just handed them to him so he can refresh himself on the mandatory conditions.

THE COURT: Of course.

MR. BIALE: I have a remark with respect to the special conditions which I'm happy to give now.

THE COURT: I want to know first whether you have an objection to the imposition of the mandatory or the standard conditions. Then we will talk about the special conditions.

MR. BIALE: No, your Honor, we have no objection to the mandatory and standard conditions.

THE COURT: As well, sir, do you believe that they are appropriate and lawfully imposed under 18 U.S.C. Section 3583(d) and United States Sentencing Guidelines Section 5D1.3?

MR. BIALE: To the extent your Honor imposes a term of supervision, yes.

THE COURT: Thank you so much.

You do want to be heard on the special conditions. I'll hear you now.

MR. BIALE:  Yes, your Honor.

As to the special conditions, I actually recently had this come up in a case before Judge Vargas where she imposed a fine, and in that case there was a sort of similar discussion about how the second condition, which is triggered based on compliance with an installment payment schedule, would sort of automatically be satisfied if my client were to pay the fine.

And our position in that case, and I think it would be the same in this case, is because the first special condition about providing any requested financial information to the probation officer is there to serve the purpose of ensuring that the defendant pays the monetary penalty, our position was it's OK to have that in there, but once he pays the fine it should be removed.

THE COURT:  You think both conditions should be removed.

MR. BIALE:  I think given that Mr. Rechnitz has paid the restitution, I think both conditions should be removed.

THE COURT:  I believe, sir, that the first condition also stands because of the nature of the offenses charged here, the counts of conviction, that in something involving fraud and bribes that it might be useful and helpful to the probation office in performing its duties to have access, as need be, to

your client's financial information.

MR. BIALE:  It might be in some case, but I don't think it is in this case, your Honor, for a couple of reasons.

One, it is undisputed that Mr. Rechnitz did not personally profit from the offense conduct.  So any money that came his way was passed along and did not end up in any account of his.

And, second, simply just because it has been six years since the original sentencing, we don't think that that condition -- we think to the extent that condition had any applicability to the offense conduct which took place more than 10 years ago, that has dissipated.

THE COURT:  I understand the point, sir.  I will make that determination in a few moments.

It would be my preference, if I impose a term of supervised release, that I can refer generally to the mandatory, standard, and special conditions without reading them word for word into the record.

Is that acceptable to you?

MR. BIALE:  Yes, your Honor.

THE COURT:  May I address Mr. Rechnitz on the points we have just been discussing?

MR. BIALE:  Yes.

THE COURT:  Thank you.

Mr. Rechnitz, you're welcome to remain seated.  I am

going to ask you to bring the microphone a little bit closer to you because we want to be sure we hear you this afternoon.

Sir, your attorney advises me that you and he have reviewed the presentence investigation report in this case. Is that correct?

THE DEFENDANT: Yes, your Honor.

THE COURT: We know that since your original sentencing the guidelines have changed. I therefore will have a slightly different guidelines analysis than what is contained in the presentence report. Other than that, I'm advised that you have no objections to its contents. Is that correct?

THE DEFENDANT: That's correct, your Honor.

THE COURT: I saw that he handed you a copy of the mandatory and standard conditions and you've had a chance to review them again, sir?

THE DEFENDANT: Yes.

THE COURT: He advises me you have no objection to those conditions. Is that correct?

THE DEFENDANT: That is correct, your Honor.

THE COURT: We have talked about the special conditions. Here I don't think I would be imposing what is currently the second condition, which is the prohibition on certain letters of credit or credit charges. I may impose the first condition about a provision of access to financial information. I may, as well, include a condition, it is simply

a recommendation of supervision in the district of residence, because I think that is easier than having someone who might live in another state be supervised here.

Mr. Biale, I suspect you have no objection to that condition if I were to impose it.

MR. BIALE:  I was just checking whether that's already in there.  Of course we have no objection to that.

THE COURT:  I think that is a condition of more recent vintage, sir.

MR. BIALE:  I see.  We have no objection to that.

THE COURT:  Mr. Rechnitz, sir, you have no objection to that either.

THE DEFENDANT:  That's correct.

THE COURT:  If I am imposing special conditions, I will certainly let you know what they are.  If I'm imposing a term of supervised release, I will certainly let you know that as well.

Mr. Rechnitz, do you agree as well, sir, that I can refer to these conditions as a group and not read them word for word into the record because you have just now read them?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Thank you.

Other than the changes to the guidelines range, I am adopting the presentence investigation report and the facts that are contained in it.

I do have a few additional questions.  Excuse me.

Perhaps, Mr. Biale, I will just let you fold this into your main sentencing presentation.  As you noted to me, it has been six years since this report was prepared.  A lot of things have changed.  At the time this report was prepared, your client had a number of listed debts that were quite significant to, I believe, family members and friends of his.  To the extent they remain, I would be interested in them.  To the extent they have been paid off, I would be interested in that fact.  And I would like to know how your client is supporting himself because at the time of sentencing I believe he was unemployed.

Those are questions, sir, that I think you can fold into your main sentencing presentation.

As for the government, I believe there is a motion you wish to make, and I'll hear from you on that now.

MS. POMERANTZ:  Thank you, your Honor.

The government moves at this time for the Court to sentence the defendant under Section 5K1.1 of the United States Sentencing Guidelines.  I'm happy to elaborate at this time if the Court would like.

THE COURT:  Yes.  There is a written submission.  I have read it.  But for you as well it has been a number of years, and I just want to get the government's position as to the completeness and the significance of Mr. Rechnitz's

cooperation and anything else you would like to tell me.

MS. POMERANTZ:  Thank you, your Honor.

The government is making the motion pursuant to Section 5K1.1 in light of the defendant's substantial assistance in a number of significant public corruption and fraud prosecutions, the details of which are laid out in the government's letter.

In short, the defendant met with the government over 80 times and his substantial assistance contributed to several investigations and prosecutions.  He testified at three trials and withstood extensive cross-examination.

The defendant significantly advanced the government's ability to investigate, disrupt, and hold others accountable for multiple significant public corruption matters.  The defendant was able to do so because he himself participated in serious crimes, crimes that affected, among others, the NYPD and the Correction Officers' Benevolent Association, or COBA. He participated in egregious crimes that are a threat to the integrity of the criminal justice system and that contribute to the public's shaken confidence in public officials.

But because his cooperation greatly assisted the government in combating that same corruption, we ask the Court to take into account his substantial assistance in fashioning a sentence in this case.

Your Honor has reviewed the extensive record before

the Court, and your Honor knows the depths of what happened. The government views its principal role today to put facts before the Court. We are not advocating for a particular sentence. That is consistent with what the government does, as your Honor knows, in the cooperator context, where we do not take a position on the particular sentence that the Court should impose, and that is consistent with the express terms of the cooperation agreement.

Consistent with our obligation to present facts which may bear on sentencing to the Court, we have also provided the Court with information and allegations relating to the defendant's more recent conduct that the government has received in connection with sentencing. The allegations are serious, and we take them seriously. They are concerning. And we have looked into certain issues flagged for the government.

The evidence currently available to the government does not demonstrate the clear breach of the defendant's cooperation agreement. And by clear breach I'm referring to a demonstrable violation of criminal law or refusal to meet with us or untruthfulness in any such meeting. We have not found those things. But that does not mean that it does not concern us that he continues to have conflicts and allegations of wrongdoing arising from business transactions.

We have made our determination, as I said, based on our assessment of evidence currently available to the

government, and we do so without prejudice to any future law enforcement actions that may result from independent investigation by a separate law enforcement agency.

Now, as to the issues, we do not believe that the allegations undermine the defendant's substantial assistance provided to the government in past cases or his truthfulness in connection with that historical substantial assistance. These allegations substantially postdate the defendant's testimony and provision of information to the government.

We credit that the defendant has dealt with difficult consequences as a result of his cooperation, namely, disparagement and harassment by certain persons who view his decision to cooperate with law enforcement in a negative light, and challenges in his relationship to his religious community where some may view his choice to cooperate with law enforcement as an act in violation of religious norms. That was a particularly acute issue, as the government understands, during his trial testimony and in the lead-up to the first trial of Norman Seabrook and Murray Huberfeld.

Now, allegations against the defendant from at least one such individual perhaps may be connected to the prior cooperation. However, we do not see a basis to attribute all such litigation or conflict to being a product of cooperation.

THE COURT: May I hear that sentence again, please.

MS. POMERANTZ: Yes, your Honor.

That we do not see a basis to attribute all such litigation or conflict to being a product of cooperation.

THE COURT:  Thank you.  It's not all retaliatory is what you're saying.

MS. POMERANTZ:  What I'm saying, your Honor, is that we do not see a basis to reach that conclusion.

THE COURT:  Thank you.

MS. POMERANTZ:  But ultimately, your Honor, the defendant is being sentenced for the crimes to which he pled guilty and the cooperation he provided.  His crimes were serious, but his cooperation was extensive.  As I said, he met with the government dozens of times and provided specific detailed accounts of the criminal activity he committed with others.  He provided emails, videos, photographs, and other materials to the government.

He testified at three trials, trials which were covered by the news media, trials during which he endured intense cross-examination by multiple lawyers over multiple days.  He promptly accepted responsibility for his conduct before he was ever charged or arrested.  His assistants helped hold responsible a powerful union leader and a hedge fund founder.

THE COURT:  I thought I understood that in his initial encounters with law enforcement he was not fully candid.  Is that true?

MS. POMERANTZ:  That is correct, your Honor.

THE COURT:  How long did it take before he became fully candid?

MS. POMERANTZ:  My understanding, your Honor, and I was not involved at that time, but my understanding is that in I think it was approximately three encounters that he was not truthful in 2015, but then, in 2016, he made the decision to come in and meet with the government and be candid and truthful in connection with his criminal activity.

THE COURT:  Thank you.

Please continue.

MS. POMERANTZ:  I refer to his assistance helping to hold responsible Norman Seabrook, who was a powerful union leader, and Murray Huberfeld, a hedge fund founder, who both engaged in conduct involving a trail and dishonesty.  He helped the government hold accountable Jeremy Reichberg and NYPD leaders for their participation in a brazen robbery scheme.

His cooperation was not limited to those two investigations.  As detailed in the government's letter, that cooperation also involved providing information and emails related to the prosecution of Hamlet Peralta, against whom the defendant was prepared to testify and who received 3500 material relating to statements that the defendant made and that resulted in, I believe, Hamlet Peralta pleading guilty a matter of days before that trial, that he was prepared to

testify before that trial.

And he provided information about the ticket resale business of Jason Nissen, as detailed in our submission, and he contributed to prosecutions related to corruption in the NYPD gun licensing division.  That is extensive, and the Court should accord that cooperation significant weight in imposing sentence.

THE COURT:  Thank you very much.

Mr. Biale.

MR. BIALE:  Thank you, your Honor.

Mr. Rechnitz began cooperating with the government in May 2016.  Barack Obama was president.  Preet Bharara was the U.S. Attorney in this district.  It feels like a lifetime ago.

The importance and quality of his cooperation have been well documented in the government's 5K1.1 motion, and I am not going to repeat the reasons that the government set forth in those motions and much of what was just put on the record by Ms. Pomerantz.

Instead, I want to talk primarily today about how Mr. Rechnitz's cooperation has affected him over the last 10 years.

But before doing that, I do want to briefly highlight just a few points that underscore how remarkable indeed his cooperation was.

I have represented clients who have cooperated in all kinds of cases.  I have never represented a client who sat for

80 proffer sessions with the government, sometimes day-long proffer sessions.

I have never had a client who testified at not one or two, but three trials and was prepared, as Ms. Pomerantz just mentioned, to testify at a fourth, until the defendant pled guilty.

There is no question, your Honor, and Mr. Rechnitz does not dispute that he was not candid when first approached by law enforcement, but he made a decision to change, to come in, to give the government the information that he had, and there is no way that those cases would have been made without the assistance that Mr. Rechnitz gave to the government.

I have never had a client in any case, whether a cooperator or not, who has waited this long for closure. And I want to pause on that because we lawyers choose to come spend our days here in the courtroom. We choose to be here day in and day out. But simply having a federal case open and pending and having to come to court can be and frequently is a source of tremendous anxiety. And I have seen, in particular with respect to Mr. Rechnitz, the toll that has taken on him over the years, over the time that I've been representing him, which, candidly, is only about half the time that his case has been pending.

Sentencing is obviously one of the most stressful moments in the lifetime of a case. I think the only thing more

stressful perhaps is waiting for a jury's verdict.

Mr. Rechnitz's last sentence before Judge Hellerstein not only resulted in a sentence that, in our view, was too high, but it also did not give him certainty and closure.  So the uncertainty that clients face and the anxiety that they face, even apart from the outcome of the case, is something that Mr. Rechnitz has had to live with, that anxiety.

THE COURT:  Excuse me, sir.  May I please understand the point you're now making.  You disagree with Judge Hellerstein's sentence and that is fine.  How is it that it did not give him closure?  Is that because you appealed that sentence?

MR. BIALE:  It's because we appealed the sentence and because that sentence, it turned out, was imposed under circumstances that were -- that was not a fair proceeding and that's why we are before this Court.

THE COURT:  Fair enough.  I just wanted to understand. I understand.

MR. BIALE:  I should say that, yes, Mr. Rechnitz did appeal, but, before that, there was a mandamus petition filed by the victim in the case.  That was litigated at the circuit. It returned to Judge Hellerstein for a restitution hearing.  So Mr. Rechnitz's direct appeal of the sentence didn't actually happen until I think three years after the sentence was imposed.

I say that all, your Honor, I am trying to make sort of a broadbrush point here, which is that the length of time -- putting aside everything else for a moment, the length of time that this case has gone on is itself a punishment that Mr. Rechnitz has had to endure.

Of course, that is not all. I'm not purely making a quantitative argument. The qualitative experience of the last 10 years has taken a severe toll on him.

Start with when his cooperation became public, which was in the summer of 2016, more than a year before he took the stand in the first Seabrook/Huberfeld trial, before Judge Carter. His face was plastered across newspapers -- in particular, the New York Post -- on a regular basis. He was called a rat. He was ostracized, threatened, harassed by members of his own community for providing information to the government about a fellow Jew.

The sentencing submission filed by Mr. Rechnitz's lawyers back in 2019 cited 675 articles that had been published about him up to that point and provided a sampling of those articles to the Court.

And in going back over those articles to prepare for today, what stood out to me, your Honor, and this is echoed in news articles that have come out since that sentencing and in social media posts and attacks on Mr. Rechnitz that have happened both on the Internet and in correspondence with this

court and with the government, what stood out to me is this.

Those attacks and that media frenzy contains relatively little outrage about the crimes. They are not primarily expressing outrage about the crimes that Mr. Rechnitz committed and admitted that he committed and pled guilty to. Rather, they attack him for being a cooperator.

This has had a severe effect on Mr. Rechnitz's daily life. When he was living in New York, he couldn't go out to restaurants. He was shunned at his own synagogue. He and his wife had to withdraw from participation in their children's school. His wife had to get off the PTA. He had to uproot his family and move his six children to Los Angeles. He couldn't be in New York anymore.

It also seriously affected his economic options. As the government said in its 2019 5K submission, of the media attention, "it gravely affected what legitimate businesses he had, as banking institutions severed their ties to his real estate syndication company and business contacts shunned him."

This has had a lasting impact, and I'll talk about this a little bit more later, I think that this sheds some light into why what Mr. Rechnitz has had to do to keep himself afloat since that time and why he has found himself in various fights, civil litigation fights, in the last few years.

It has been well documented, and the government touched on this, that the process of his cooperation during the

trials was grueling.  Mr. Rechnitz testified at three trials at considerable length, and as the government said in its first 5K, "he did so under a kind of duress that is atypical of the experience of cooperating witnesses."

The government had to bring him in and out of the courtroom through the garage.  The kind of intimidation and harassment that he experienced, especially during the Jeremy Reichberg trial before Judge Woods, is really astonishing. Antagonists filled the gallery.  They held up pictures of a rabbi to try to shame Mr. Rechnitz while he was testifying. They blocked his exit from the courtroom to such an extent that Judge Woods had to let him take breaks in the robing room while he was testifying.  By the way, his testimony, just his cross-examination, in that case lasted eight days.

There was also a physical altercation in that case in the hallway between a defense lawyer and an AUSA, stuff that is just impossible for me to fathom, frankly.

Other than that last piece, which I have never heard of happening in this courthouse, the other things that happened to him are the kinds of things that you worry about as a lawyer when your client is testifying as a cooperator in a gang case, in a case with serious violence, in a murder in aid of racketeering case, not in a white collar bribery case.

And Mr. Rechnitz knew, of course, when he made the decision in 2016 to come in and work with the government, he

knew there would be consequences. He knew that there would be religious consequences, that there would be condemnation from the community. But I don't think he or frankly anyone else at that time could have imagined all that he ultimately had to endure.

Unfortunately, your Honor, that harassment, that intimidation has continued, even though the conduct is now old, even though Mr. Rechnitz moved to Los Angeles, and even though he has tried hard to put these matters behind him.

In Los Angeles, he has been shouted at on the street. He has been filmed in restaurants. Just in the last two weeks a business contact who is in a dispute with him tried to get Mr. Rechnitz's 17-year-old son's cell phone number from a friend of his son's in high school.

That same individual texted Mr. Rechnitz a few weeks ago a threatening message, including ominously texting him the email address of the AUSA in this case.

It is not just Mr. Rechnitz who has suffered harassment. His family too. His wife and his mother have received threatening messages. Even his rabbi has been harassed. His rabbi has received calls, the latest of which came in just a few weeks ago telling him he should be run out of town simply because he allowed Mr. Rechnitz into the congregation.

Your Honor has seen firsthand now the kind of vitriol

that has been directed against Mr. Rechnitz. The Court and the government have been deluged with filings, unsolicited filings of people trying to affect this sentencing, trying to get some kind of revenge; again, not because of the crimes he committed, but because of his cooperation. One of those people is a former Platinum Partners employee and has publicly declared on social media that that's what he's trying to do, trying to get vengeance on the rat. That individual is here today in the courtroom.

Our view, your Honor, with respect to the government is that these all have a common nucleus that they are retaliatory based on his cooperation. I set forth the reasons why we believe that in my letter of March 16.

I don't think the Court needs to resolve that question, though. As the government said just a few moments ago, none of that takes away from Mr. Rechnitz's cooperation and the valuable assistance that he provided to the government.

Frankly, your Honor, I don't want to give any more air time to these critics, to these antagonists, who I would note always seem to come up right on the eve of Mr. Rechnitz's sentencing.

Now, let me address the handful of judgments and settlements. I am not going to go into the details of them. The Court knows about those. There has been a handful of those since his sentencing in 2019.

The Court is aware of the issues related to Mr. Rechnitz's jewelry business that spawned some of that litigation. I won't go into that.

I think it's notable, your Honor, that two of the individuals who were the plaintiffs in those cases, in the cases that have been resolved in judgments and settlements, wrote to the Court to support Mr. Rechnitz. I think one of their letters, I believe it's from Mr. Ladou, is telling, which is that he says that Mr. Rechnitz was not able to pay him on time. And because of all the media attention and all the rumors that he had heard about Mr. Rechnitz, he assumed the worst. He assumed that he had been a victim of a scam. That's understandable to jump to that conclusion but, as he learned more and Mr. Rechnitz made good on his promise to him, he has become a friend. He came to support him.

Now, look, perhaps Mr. Rechnitz should not deal with people who are so ready to go to court every time he is delayed on a payment. But as the government has noted, and I have made this argument, he is limited in who he can do business with. Some people have, unfortunately, seen an opportunity, given his compromised legal position.

But, and this is a very important point I want to make, your Honor, Mr. Rechnitz does not see himself as a victim because of that. As he put in his letter to the Court -- he addressed this in his letter to the Court which was appended to

my January submission.  He said that all of these kind of interactions are part of "the long shadow my actions cast."  He accepts that, fair or not, these are the consequences of his decision, his decisions, his poor decisions, consequences he has to live with.

Of course, your Honor, it is imperative that he honor his obligations.  There is no question about that.  The impact of his prior conduct has also made that difficult for lots of reasons, financial and otherwise.  He has obviously had a lot of legal bills over the course of more than the last 10 years.

To the extent the Court has concerns about those issues, those are concerns that could be addressed through, for example, the special condition that we were talking about before of supervision.  They do not need to be addressed through a carceral sentence.  Any mistakes that Mr. Rechnitz has made along the way, since he began his cooperation, should not and do not overshadow his good and productive work.  He has worked hard to earn an honest living, and, your Honor, he has primarily been able to do that working as a manager for Floyd Mayweather, who is a friend, who stood by him when everyone else abandoned him.

He has worked hard to support his family, including being there for his six children, being emotionally available, being open with them, being honest with them about what he has gone through and why they should not follow his example but

instead should learn from it.

He has been attending to his religious faith. And he has worked on behalf of victims of terrorism, as described in the letter by Mordechai Fried, including bringing Mr. Mayweather with him to help provide supplies and visit victims of the October 7, 2023 attacks in Israel.

Mr. Rechnitz cannot control fully how other people interact with him. But looking at what he can control, your Honor, I think it is clear that he has made real sustained efforts to turn his life around and to reform.

Let me say a word about comparison cases and disparities.

On pages 45 to 47 of the government's 2019 5K letter, there is a very extensive recitation of the sentences of white collar cooperators at that time. Many of those individuals were sentenced to time served, no jail time sentences, and there are individuals who provided less valuable information to the government and suffered far less than Mr. Rechnitz has suffered.

Let's talk briefly about the other defendants in this case. Murray Huberfeld was originally sentenced to 30 months. That sentence was reduced to seven months by Judge Liman. He was given a seven-month sentence. Jeremy Reichberg, who was sentenced to 48 months by Judge Woods, served approximately 13 months of that sentence.

THE COURT: How did that happen, sir?

MR. BIALE: He was released on a medical furlough.

Michael Harrington, who pled guilty, and I don't think there is any question he is less culpable than Mr. Rechnitz, but also didn't cooperate, it was just on a guilty plea, he was sentenced to no time.

The only outlier, your Honor, is Norman Seabrook, and the Court, as I understand it, is now very familiar with the particular circumstances of that individual.

So it would not be an unwarranted disparity to sentence Mr. Rechnitz to time served. Rather, it would send the right message, your Honor, about the importance of accepting responsibility, the importance of cooperation, and the importance of reform over the passage of time.

I'm almost done.

THE COURT: Please take whatever time you need.

MR. BIALE: I am going to talk about one more thing.

This was obviously not an easy sentencing to schedule. There were many delays. We weren't sure even if we were going to keep this date. I'm supposed to start a trial Monday, God help me. So if this date didn't hold, I was concerned.

Mr. Rechnitz was also concerned and expressed concern to me several times about the sentencing being pushed into the week of Passover, which is coming up the week after next. And as your Honor knows, that is a very important holiday to Jewish

people that celebrates the exodus of the Israelites from slavery in Egypt.

And of course, as the story goes, they don't go straight from Egypt to the promised land. They wander in the desert for 40 years. And along the way they make mistakes. They worship idles. They build a golden calf. They do all kinds of things that anger God before coming back to him through the leadership of Moses, the law giver.

Your Honor, when Mr. Rechnitz made the decision to cooperate 10 years ago, he was attempting to free himself from the slavery of his ambition and his ego, and he was trying to follow a different path, a right path, a true path, and he has been wandering in the desert, your Honor, since that time.

Now, one of the songs we sing at the Passover seder, one of the oldest songs is called *Dayenu*. It translates to enough, you know it. It talks about, even if God had just let the Israelites out of Egypt, that would be enough, Dayenu. Even if he had just given us the torah, the word of God to live by, that would be enough, Dayenu. Even if he had only brought the Israelites to the promised land, that would be enough.

After 10 years, three trials, and two sentencings, I respectfully request that the Court say Dayenu, put an end to this case, sentence Mr. Rechnitz to time served with no supervision to follow. Thank you.

THE COURT: Thank you, sir.

Mr. Rechnitz, at this time, if you'd like to speak, you're invited to do so.  You are not obligated to do so.

I'll ask you, please, to remain seated and bring the microphone close because I want to be sure we all can hear you.

If you are going to be reading from notes to help yourself, just be a little slower and a little louder than you think you need to so we can all hear you.

You may begin whenever you're ready.  If you need to speak to your attorney first, please do that.

THE DEFENDANT:  No.

Your Honor, there is not a single day that I don't think about what I did.  It weighs on me when I wake up and it stays with me when I go to sleep.  I live with the reality that I chose to betray everything I was taught and everyone who trusted me.

I was raised in a home filled with love, faith, and strong values.  My parents taught me to fear God, to be honest, and to treat people the right way.  I knew these principles.  I believed in them.

Your Honor, I know you have many people who come before you that do not have the advantages that I had, who did not have someone to teach them values to live by.  I had that, and yet I walked away from these values.  This is something I struggle to understand about myself and something I carry deep shame for.  I hurt many people with my actions, and I want to

apologize to all of them.

I would like to start by acknowledging the pain I have caused to my family. When this all started, my children were young and innocent. They did not know what was happening. Now they are older and they know. I've had to sit down with them and explain in the most honest way I can that their father committed crimes, that I made serious moral failures, and I hurt people.

There is no way to describe how painful those conversations are. There are moments as a father that stay with you forever. For me it is seeing confusion in their eyes, hearing their questions, and knowing I'm the reason they have to carry this burden. They did nothing wrong, yet have had to deal with the attention, judgment, and embarrassment because of me.

Telling my two oldest children who stayed with me at the hotel last night not to worry was very difficult. I asked them not to come to this proceeding because I did not want them to have this in their memory forever.

I think about the example I set for them and it breaks my heart. I was supposed to teach them integrity, responsibility, and faith through my actions, and instead I showed them the consequences of failing to live by those values.

I want to apologize deeply to my wife, Rachel.

Tomorrow is our 21st wedding anniversary. So much has happened in these past years. As we can see today, I made big mistakes in my twenties and early thirties, and I brought us to this day. You did not sign up for this, but you have stood by me throughout it. I love you so much. I also want to -- sorry.

THE COURT: Please take your time, sir.

THE DEFENDANT: I also want to apologize to my parents, who are sitting here as well. They have suffered a lot.

I ask God for forgiveness, and I ask for the strength to become the father my children deserve and the husband my wife deserves. I know that forgiveness is not something that I am owed and it is something I'll have to work for the rest of my life.

I failed the people who trusted me and hurt people I did not even know, including the COBA members who relied on others to act in their best interests. I pushed for something I believed would succeed, but my judgment was not clean. It was influenced by my own selfishness and ambition. I let my ego take control and failed to follow my moral compass. That failure is something I will carry with me for the rest of my life.

I would like to apologize directly to COBA and its members for the harm that I caused them.

When I realized the seriousness of what I had done, I

made the decision to cooperate and to tell the truth. That was not an easy decision, your Honor. It has come with consequences that I will continue to live with, but it was the first step in trying to be honest again after years of dishonesty. I know that cooperation does not erase what I did, it does not undue the harm, it does not take away the pain I caused my family or others. It is simply part of trying to take responsibility. It was a step.

The hardest part of this has been living with myself and coming to terms with what it means for my sense of my own identity and my relationship with God. The public consequences, the loss of reputation, the judgment, those are real.

But what is even harder is the private reality knowing who I became, someone who acted like the rules did not apply to me.

THE COURT: I just ask you to slow down so I can take better notes. We understand that this is very stressful. Thank you.

THE DEFENDANT: The public consequences, the loss of reputation, the judgment, those are real.

But what is even harder is the private reality, knowing who I became, someone who acted like the rules did not apply to me, someone who betrayed my own values and those of my religion.

I have spent years reflecting, praying, and trying to rebuild my life the right way. I am trying to be present for my family in a way that I was not before. I'm trying to return to my faith in a real and meaningful way. I will try my best to do things the right way.

I know I cannot undo what has been done. I cannot go back and fix it. All I can do is spend the rest of my life trying to live differently, trying to make amends and trying to be a better man. I want to be there for my children, to guide them the right way moving forward and to show them through my actions, not just my words, that people can change, that accountability matters and that faith and integrity can still be reclaimed.

I would like to once again apologize to all those I hurt and betrayed. I also want to apologize to the Court and express my appreciation both to your Honor and to the government. I am deeply sorry.

Finally, I want to say that while my cooperation came along with many challenges I did not foresee, many which I continue to live with today, I feel strongly it was the right thing to do. And if I were faced with the decision today, I would cooperate again. Thank you.

THE COURT: Thank you very much, sir.

Mr. Rechnitz, as you can see, these proceedings have taken some time, and I have taken a lot of notes. I do not

come out on the bench with a sentence already in mind.  I
actually need to sit and need to hear from everyone.

I am going to step off the bench for about five or ten
minutes so that I can put together my thoughts.

I want you to understand, sir, that I'm not doing this
to create or heighten what is otherwise an anxious time.  I
have found that I can be most open if I sort of allow my mind
to remain open until I hear from you.  I now have.

I will be back as soon as I can.  I thank you all in
advance for your patience.

(Recess)

THE COURT:  I am going to describe the sentence that I
intend to impose, but I'll give the parties an opportunity to
make legal objections before the sentence is actually imposed.

In imposing sentence I must consider factors set forth
by Section 3553(a) of Title 18 of the United States Code.  Some
of these factors have been discussed this afternoon, but they
include the nature and circumstances of the offense, the
history and characteristics of Mr. Rechnitz, the need for the
sentence imposed to reflect the seriousness of the offense, to
promote respect for the law, to provide a just punishment for
the offense, to afford adequate deterrence to criminal conduct,
to protect the public from further crimes by Mr. Rechnitz, to
provide him with needed education, vocational training, medical
care, or other correctional treatment in the most effective

manner.

I must consider the sentencing guidelines and any applicable policy statements. As Mr. Biale noted, I must consider the need to avoid unwarranted sentence disparities among similarly situated defendants. And in some cases, though not this one, I must consider the need to provide restitution.

My guidelines calculations are as follows. There are two groups in this instance, one involving the public honest services fraud and the other involving the private honest services fraud.

As to the first, the base offense level is 12 under 18 U.S.C. 1349 and guidelines Section 2C1.1. There is a two-level enhancement because there was more than one bribe. There is a 12-level enhancement because the bribes exceeded $400,000. There is a four-level enhancement because the bribes were made to individuals with high-ranking, decision-making positions. That yields an adjusted offense level of 30.

As for the second, the private honest services fraud, the base offense level is 8. Under guidelines Section 2B4.1, there is a 20-level enhancement for the amount of the improper benefit.

Grouping these two groups together, which I realize, for those of you who don't do this for a living, it sounds very abstruse, and I'm sorry for that, but that is the way the guidelines work. I arrive at a post-grouping adjusted offense

level of 32.  There is a two-level reduction because Mr. Rechnitz has no criminal history points.  There is a three-level reduction for acceptance of responsibility.  And that yields an adjusted offense level of 27.

As I just mentioned, Mr. Rechnitz is in criminal history category I, because he has no criminal history points, and his guidelines range is therefore 70 to 87 months, and I will amend those sections of the presentence investigation report to make that clear, that that is what the guidelines range is.

The government has moved that I sentence Mr. Rechnitz without regard for the otherwise applicable guidelines because of the substantial assistance that he has rendered in the investigation and prosecution of other people.

And I want to pause to thank everyone for the submissions.  They were incredibly comprehensive and detailed, and I mean this both as to the ones filed in 2019 and the ones filed today.  So I really do think I have a complete picture of what happened and what Mr. Rechnitz did in response to that.

To his great credit, his cooperation when it began was full throated in the face of obstacles that, as Mr. Biale pointed out, one doesn't normally see in this context.

Based on what I'm hearing, it appears that he has gotten himself on a better financial footing.  I believe, more importantly, he has gotten himself on a better footing with his

family and with his religion.

As best I know, while he has been out on release, he has remained law abiding and that's over an extended period of time, and I appreciate that in connection with the prior component of our proceedings, he promptly paid the restitution figure assessed.

I do want to note on the other side of the ledger, because I have to look at both, that the conduct is quite serious, and it extended over an enormous length of time. It is distressing to me that what it did was to promote corruption among public servants and basically the trading of favors. There was almost a banality to the conduct and it was as egregious as the government suggested. Mr. Rechnitz, while not the proximate cause, is sort of the but-for cause of a lot of losses and a lot of harm to a lot of people.

And so what I have been thinking about and indeed wrestling with is my acceptance of Mr. Rechnitz's cooperation. I accept, sir, that you have done all that you can to atone for the criminal conduct in which you engaged, because I believe that you have, and that is one very important factor that I must consider.

There are, sir, other factors I must consider as well. And as long as I have spent thinking about this case, and it has been over a period of actually weeks, I remain concerned about the seriousness of the offense and the impact on the

public and the sheer scope of the corruption.

While Mr. Biale made truly superlative arguments for Mr. Rechnitz and has done a wonderful job, I mean not to malign his assistants, but I have thought and I have tried and I have considered very seriously the defense's request. But given the nature of the conduct, I cannot go to the sentence that he wishes me to go to.

Therefore, I am going to downwardly depart or downwardly vary, because people use different terms, to a term of five months' imprisonment followed by a term of two years of supervised release. I am not imposing the home confinement condition. I don't think that is necessary.

I understand if after a period of one year the probation office seeks to have the term of supervised release terminated, but given the financial issues and the concerns that I have about his finances, I do want there to be a term of supervised release, and I do want there to be the special condition of providing financial information as requested by the probation office. I do think it is appropriate on the facts of this case.

I am not going to order a fine. I believe restitution, it has been ordered and it has been paid. There is no forfeiture that I'm aware of, and I will order a special assessment of $100.

Ms. Pomerantz, is there any reason why I may not

impose this sentence?

MS. POMERANTZ:  No, your Honor.

THE COURT:  Mr. Biale, is there any reason why I may not impose this sentence?

MR. BIALE:  Your Honor, there is no legal reason, but we would ask that the Court have Mr. Rechnitz serve the five months that you're imposing on home confinement, given his obligations to his six children.

THE COURT:  Denied.

Mr. Rechnitz, please stand.

Mr. Rechnitz, after considering all of the factors set forth in Section 3553(a), after considering the guidelines, after listening and rereading all of the submissions in connection with sentencing, I find that a term of five months' imprisonment is sufficient but no greater than necessary to comply with all of the purposes of sentencing.

That period of imprisonment will be followed by a term of two years of supervised release with the mandatory and standard conditions we spoke about earlier and with the special conditions, a provision of information about your financial state to the probation office upon request and a recommendation of supervision in your district of residence.

I'm not imposing a fine or forfeiture.  Restitution has been satisfied.  I must impose a mandatory $100 special assessment.

Sir, do you understand?

THE DEFENDANT: Yes.

THE COURT: Please be seated, sir.

Mr. Rechnitz, you have the right to appeal from your conviction and from your sentence. And if an appeal is something in which you're interested, please speak with your attorney. He's familiar with the process by which an appeal is taken. Generally speaking, you have two weeks to file the notice of appeal from the date that the written judgment is entered. That will probably be sometime early next week.

Do you understand, sir?

I do not hear you.

THE DEFENDANT: Yes.

THE COURT: Thank you.

Mr. Biale, I'm not going to order remand at this time. It was my intention to order surrender at a place of designation. It has been my experience that it takes about six to eight weeks to designate.

Is there a facility that you would like me to recommend?

MR. BIALE: Yes, your Honor. We would like you to recommend Lompoc, which is a facility near Los Angeles.

THE COURT: Yes, sir. I forgot which coast we were on. Thank you very much.

MR. BIALE: Your Honor, I would ask, consistent with

the sentence that was imposed before, which was a split sentence, that your Honor consider splitting the sentence between imprisonment and home confinement.

THE COURT:  Sir, I have thought about that, and I did not think the five months of home detention were necessary.  I do think the five months' incarceration is.  That's why I have done it that way.  I could have done exactly what Judge Hellerstein did, and I understand why he did it.  In all candor, sir, I thought about something higher, but I did not think it was appropriate for me to go above the term of incarceration that he set.

MR. BIALE:  I'm asking your Honor that you split the term of incarceration.

THE COURT:  I know what you're asking for, sir.  It is denied.

MR. BIALE:  Thank you.

THE COURT:  Ms. Noriega, may I please have a surrender date about eight weeks out.

THE DEPUTY CLERK:  May 8 before 2 p.m.

THE COURT:  Ms. Pomerantz, are there open charging instruments?

MS. POMERANTZ:  No, your Honor.

THE COURT:  Thank you.

From the government's perspective, is there anything I have omitted doing this afternoon?

MS. POMERANTZ:  No, your Honor.

THE COURT:  Thank you.

Mr. Biale, from your perspective, is there anything I have omitted doing this afternoon?

MR. BIALE:  No, your Honor.

I have one more application, which is that Mr. Rechnitz be permitted to stay out on bail pending appeal of the sentence.  To the extent --

THE COURT:  You can make that argument, sir.  I would think that to do that I'd have to find that I committed an error in this proceeding this afternoon.

MR. BIALE:  I think that you would have to find that there is a likelihood of reversal.  I don't think that you have to find that you yourself believe it was in error.

THE COURT:  Tell me why I am going to be reversed.  I don't believe that there is something that I've done this afternoon that warrants reversal, sir.  I appreciate that the circuit may disagree, or they may decide to do that because they perceive that it would be an inutility to have the sentence completed before the appeal is completed.  You can get it from them, but I don't have a basis to grant it, sir.

MR. BIALE:  Thank you.

THE COURT:  Thank you, everyone.  We are adjourned.

(Adjourned)